CALIFORNIA WINE ASSOCIATION, Respondent, v. WISCON-
SIN LIQUOR COMPANY OF OSHKOSH, Appellant.
SAME, Respondent, v. WISCONSIN LIQUOR COMPANY OF
GREEN BAY, Appellant.
SHEBOYGAN-BADGER LIQUOR COMPANY, Appellant, v.
CALIFORNIA WINE ASSOCIATION, Respondent.

*April 5—April 30, 1963.*

For the appellants there was a brief by *Shea & Hoyt,* attorneys, and *Ralph M. Hoyt* and *Hamilton T. Hoyt* of counsel, all of Milwaukee, and oral argument by *Ralph M. Hoyt* and *Hamilton T. Hoyt.*

For the respondent there was a brief by *David E. Beckwith* and *Jesse D. Miller,* and *Foley, Sammond & Lardner,* all of Milwaukee, and oral argument by *Mr. Beckwith* and *Mr. Miller.*

BROWN, C. J.

## The Actions.

Counterclaims were brought by defendant-appellant Wisconsin Liquor Company of Oshkosh, and by defendant-appellant Wisconsin Liquor Company of Green Bay, for damages for breach of exclusive distributorship contracts against plaintiff-respondent California Wine Association, which had previously commenced actions against these defendants for payments for merchandise received. Later plaintiff-appellant Sheboygan-Badger Liquor Company

commenced an action against California Wine Association also for damages for breach of an exclusive distributorship contract.

These actions were consolidated for trial, and the two suits brought by the California Wine Association were settled by stipulation, leaving for trial only the counterclaims and the action by the Sheboygan-Badger Liquor Company. For convenience, the liquor companies will be referred to collectively as the "Peckarsky Companies," and the California Wine Association as the "Association."

Trial was to the court which found among many other findings of fact that the Association wrongfully terminated exclusive distributorship contracts with the Peckarsky Companies. The trial court made several findings of fact regarding the calculation of damages for breach of contract and awarded each of the Peckarsky Companies a separate amount which in the first two actions were setoffs against the amount owed to the Association for merchandise received. In each of these actions the Peckarsky Companies appeal from the whole of the judgment and the Association files notice of review.

*The Facts.*

In 1933, Wisconsin Liquor Company, a Wisconsin corporation located in Milwaukee, Wisconsin, was engaged in the wholesale distribution of whiskies, brandies, wines, and other liquors in 19 contiguous counties in the eastern part of Wisconsin. It was equally owned by Sam Pokrass and Hyman Peckarsky. From 1937 to 1944, Herman E. Case was its general manager and handled virtually all of its affairs. Wisconsin Liquor Company had two large suppliers, National Distillers from which it purchased whiskies, and the Association from which it purchased brandies and wines. The Association, prior to 1951 known as the Fruit

Industries, Ltd., is a co-operative organized under the California co-operative laws. It is technically known as a federated co-operative because a majority of its members are co-operatives in themselves. The Association manufactures and sells a complete line of champagne, wine, and brandy, at both the popular price level and at the premium price level. Material here are its premium wine labeled "Ambassador Wine," and its brandy labeled "Aristocrat." Walter Taylor was its chief executive officer, known as the vice-president and general manager until 1950, at which time Mario Perelli-Minetti became its chief officer.

Until his death in 1956, George Huckins represented the Association in its Chicago, Illinois, office for the 12 midwestern states, including Wisconsin. He also operated a brokerage partnership selling the Association's products to wholesalers and distributors. At various times Huckins had different partners, including for a time Herman Case.

In 1933, the Wisconsin Liquor Company was not only a distributor but was also a rectifier of wine and brandy. It bottled and labeled its own brandy and sold it along with certain brands from the Association. In 1941, immediately prior to the war, the amount of brandy sold was nominal. In that year there had been available surplus bulk brandy, and the Wisconsin Liquor Company purchased several hundred barrels of so-called prorate brandy in California. Early in 1942, the OPA established ceiling prices and as a result brandy began to become a better seller. In 1942, Herman Case approached George Huckins with a plan to sell this brandy to the Association, which would bottle it under its Aristocrat label. The Wisconsin Liquor Company would then buy the Aristocrat brandy back from the Association. This plan was adopted at a second meeting three months later. During this second meeting Walter Taylor was present, and the actual prices at which the bulk brandy

was sold to the Association and repurchased by the Wisconsin Liquor Company were settled. Thereafter, the Wisconsin Liquor Company concentrated on the sale of Aristocrat brandy.

On June 30, 1945, the Wisconsin Liquor Company was split between Sam Pokrass and Hyman Peckarsky, its principal owners. The corporate entity, Wisconsin Liquor Company, continued to operate but under the ownership of Sam Pokrass and only in Milwaukee and Waukesha counties. The remaining 17 counties went to Hyman Peckarsky. Wisconsin Liquor Company transferred the physical assets which comprised the branch operations in Oshkosh and Green Bay and the shares of stock formerly held by the Wisconsin Liquor Company in the Racine Beverage Company, Badger Liquor Company, and Sheboygan Liquor Company to Hyman Peckarsky in return for Peckarsky's Wisconsin Liquor Company stock.

Hyman Peckarsky and his son, Irvin, formed the Wisconsin Liquor Company of Oshkosh and the Wisconsin Liquor Company of Green Bay out of the former Oshkosh and Green Bay branches of the Wisconsin Liquor Company. In 1950, the Peckarskys sold the Racine Beverage Company which operated in the counties of Walworth, Kenosha, and Racine, and the Sheboygan Liquor Company and Badger Liquor Company were consolidated into a new corporation known as the Sheboygan-Badger Liquor Company. The three surviving companies owned by the Peckarskys are the present appellants.

For a short period following the split between Peckarsky and Pokrass, the Peckarsky Companies were required to make all purchases of inventory from or through the Wisconsin Liquor Company then owned by the Pokrass family. After a few months the agreement which gave rise to the split was modified and the Peckarsky Companies were per-

mitted to purchase inventory directly from the suppliers. The Peckarsky Companies first arranged for direct purchase with National Distillers, the company which had been the principal whisky supplier of the Wisconsin Liquor Company. Then they arranged for direct purchases from the Association in a meeting in Chicago with George Huckins. Prior to this conference in Chicago, the split between the Pokrasses and the Peckarskys had not caused any change in distribution with respect to the Association for it continued to sell to only one distributor in eastern Wisconsin, namely, the Wisconsin Liquor Company. After this conference, the Association sold directly to the Peckarsky Companies, and the latter were its sole distributors in that area.

From 1945 to 1959, the Peckarsky Companies sold virtually only Aristocrat brandy although it handled some competitive brands. Both the Peckarsky Companies and the Association vigorously promoted the sale of Aristocrat through extensive programs of salesmen's benefits and advertising. In March and April, 1947, the Association specifically authorized advertisements to be placed in a number of newspapers in Wisconsin cities describing the Peckarsky Companies as its exclusive distributor of Aristocrat brandy.

In 1947, Irvin Peckarsky learned that Kuechenberg, a salesman for another company, was selling the Association's products in the city of Fond du Lac which was in the Peckarsky territory. Peckarsky contacted Richard Sayre, the Wisconsin representative of the Association, and protested. Sayre investigated and discovered that Kuechenberg was getting products from Sam, Pokrass. Sayre and Huckins talked with Pokrass, and they secured the latter's promise to discontinue selling to Kuechenberg, which he did.

In April, 1951, after Herman Case left the Huckins' partnership, Joseph Lubar of the P & J Sales Company,

Appleton, Wisconsin, persuaded Huckins to permit him to sell Ambassador wine and brandy which the Peckarsky Companies did not sell. When the Peckarskys learned of this matter they complained to Huckins who immediately ceased selling the Association's products to Lubar. In a letter to Joseph Lubar dated August 13, 1951, in which the P & J Company orders were canceled, Huckins wrote that it was impossible to have two wholesalers in the same area.

By a letter written to Irvin Peckarsky in November, 1957, Perelli-Minetti acknowledged that an exclusive dealership existed between the Association and the Peckarsky Companies. In this letter he sent a copy of another letter he had written to Irving Pokrass in which he discussed the merits of exclusive distributorships and stated:

"EXCLUSIVE TERRITORY—Both of us agree in an exclusive distribution system within any given territory. It protects the efforts of the distributor in building volume, its easier on the parties involved and it makes possible the fixing of responsibility on both supplier and jobber. . . .

"Our policy is one of an honest exclusive distributorship. We have enforced it on occasion when required to do so. We hope that this will not be true here.

"In short, if the exclusive distributorships are not respected by you, or by others coming into your territory, we will be forced to take appropriate action, and in any event, we must have a substantial increase in volume by the end of the year, or we shall feel free to consider other arrangements."

From 1949 to 1961, in their 14-county territory, the Peckarsky Companies were the leading distributors of Aristocrat brandy in the entire United States. The volume of sales of the Peckarsky Companies of Aristocrat brandy from 1945 to 1961 was very substantial, and until the last few years the annual percentage of growth also was substantial.

The business relations between the Association and the Peckarsky Companies were apparently harmonious until January, 1959, when Perelli-Minetti was informed that the Peckarsky Companies had become the exclusive distributor for a line of wines and brandy of Paul Masson Company. Although the Peckarsky Companies were exclusive distributors for other companies, the Paul Masson Company was a fierce competitor of the Association and had been successful in competing against it in other areas of the country. The reason given by the Peckarsky Companies for obtaining the Paul Masson line was that it had certain wines which were better sellers than those of the Association. The Peckarsky Companies had been selling the Association's Ambassador wine without much proven success over the past years and completely ceased selling it in 1959.

This event precipitated a growing feeling of mutual distrust between the Association and the Peckarsky Companies. After protesting to the Peckarskys, Perelli-Minetti informed them that he was considering the appointment of a dual distributor in the Sheboygan-Badger Liquor Company territory. On March 17, 1959, without giving prior notice to the Peckarskys, Perelli-Minetti announced that the Imperial Distributing Company was a dual distributor in the Sheboygan-Badger territory. On March 19, 1959, the Imperial Distributing Company began selling Aristocrat brandy in that area. The Peckarskys immediately protested but failed to have the operations of the dual distributor discontinued. The Sheboygan-Badger Liquor Company, however, continued to order products from the Association and competed with the dual distributor by giving deep deals to its customers. Although deep dealing (the giving of free bottles of brandy with a particular amount of cases purchased) had not been practiced before, the Sheboygan-

Badger Company undertook to engage in this business device. Upon learning of this new business practice of the Peckarsky Companies in the Sheboygan-Badger territory, Peckarsky Companies' customers in other territories desired similar deep deals.

On September 1, 1960, the Association authorized the Imperial Distributing Company to distribute its products in Fond du Lac and Manitowoc counties. The Peckarskys immediately protested to the Association but without avail, and the Peckarsky Companies in the territories in which there was a dual distributor continued to order products from the Association.

In the summer of 1960, the Association reduced credit terms from ninety days to sixty days and adopted a policy of refusing to make shipments if payments were not made on time. By April 20, 1961, the previous delinquent accounts of the Peckarsky Companies were settled and brought current.

The relations between the Association and the Peckarsky Companies became further strained in 1961, due to new credit policies of the Association. On April 20, 1961, the Association by letter reduced the credit terms to forty-five days and stated that the credit period would run from the date of shipment and not the date of receipt. The letter also stated that interest would accrue on any unpaid balance at the rate of six percent, and that if outstanding amounts were not paid within a stated time the Association would feel free to add one or more distributors in the Peckarsky territory. The Peckarsky Companies refused to abide by these terms, stopped payments on some checks, and in May, 1961, withdrew promotion on the Aristocrat brandy by stopping deep deals.

On May 9, 1961, the Gateway Liquor Company was made a dual distributor in the remaining Peckarsky terri-

tory. Again the Peckarskys vigorously protested to the Association.

During May, 1961, the business relations reached a new low. On May 29, 1961, a carload of brandy was shipped by the Association consigned to itself but in care of the Wisconsin Liquor Company of Oshkosh. The sales price of the merchandise was $90,028.44 and payment was due July 13, 1961. The goods were received by the Peckarsky Companies on June 5, 1961, at which time they took them into their possession. On July 24, 1961, the Wisconsin Liquor Company of Oshkosh issued its check in payment for this sum. The Association warned the Peckarskys that if payment was stopped on this check the Peckarsky Companies would no longer be a distributor of the Association. On July 30, 1961, the Peckarsky Companies stopped payment on this check, and on the following day the Association informed the Peckarskys that a distributorship relation between them no longer existed.

The Association then commenced the present actions to recover payments for goods that it had shipped to the Peckarsky Companies. Peckarskys' Wisconsin Liquor Company of Oshkosh and Wisconsin Liquor Company of Green Bay counterclaimed for damages for breach of exclusive distributorship contracts, and Sheboygan-Badger Liquor Company brought a separate action against the Association for the same reason.

The issues presented by this appeal for our determination are:

(1) Whether an implied exclusive distributorship is contrary to the great weight and clear preponderance of the evidence.

(2) Whether reasonable notice was necessary to terminate this agreement.

(3) Whether the calculation and measure of damages by the trial court were proper.

(4) Whether the allowance of interest for the unpaid merchandise received by two of the Peckarsky Companies was proper.

(1) *Implied Exclusive Distributorship.*

Exclusive distributorship contracts between a manufacturer and a wholesaler have caused no little confusion in the law. These contracts in order to be binding, unless based upon a present valuable consideration, must impose upon each of the parties some obligation such as mutual promises. See Annos. 14 A. L. R. 1300, 1301, and 26 A. L. R. (2d) 1139. We have often held that mere forbearance of a distributor to sell competitors' products in an area without any undertaking to order any of the manufacturer's products at all is lacking for want of mutuality. *Hoffmann v. Pfingsten* (1951), 260 Wis. 160, 168, 50 N. W. (2d) 369. See also *Teipel v. Meyer* (1900), 106 Wis. 41, 81 N. W. 982; *Pessin v. Fox Head Waukesha Corp.* (1939), 230 Wis. 277, 278, 282 N. W. 582, and *Strauss v. Eulberg Brewing Co.* (1947), 250 Wis. 579, 27 N. W. (2d) 723. However, we recognize, and there is authority in other states so holding, that a promise to promote the sale of the manufacturer's product or a *bona fide* effort to pursue the contract is sufficient consideration for an exclusive distributorship contract. *Hoffmann v. Pfingsten, supra,* at pages 168, 169; *Clarke Floor Machine Co. v. De Vere Chemical Co.* (1960), 9 Wis. (2d) 517, 522, 101 N. W. (2d) 655; *Graham v. Lamp* (1921), 174 Wis. 373, 376, 183 N. W. 150. Authorities in other states: *Fred Allen Automobile Supply Co. v. H. W. Johns-Manville Co.* (1918), 211 Ill. App. 217, discussed in 26 A. L. R. (2d) 1168, 1169; *J. C. Millett Co. v. Park & Tilford Distillers Corp.* (D. C. Cal. 1954), 123 Fed. Supp. 484, 493; *Hunt Foods v. Phillips* (9th Cir. 1957), 248 Fed. (2d) 23, 30.

In the present case, the trial court found that the promises which supported the exclusive arrangement were implied by the conduct of the parties. An implied promise is not prevented from being a sufficient consideration by the fact that it is implied by the court from the conduct or from words that are not in express promissory form. 1 Corbin, Contracts, p. 456, sec. 144.

The trial court found that the exclusive distributorship contract was oral. This finding cannot be sustained because the record does not reveal any oral contract. But in the trial court's decision it referred to the contract as implied. We can look to the decision of the trial court for material findings not covered by the formal findings of fact. *Morn v. Schalk* (1961), 14 Wis. (2d) 307, 313, 111 N. W. (2d) 80. Therefore, we will view the finding of the trial court as one referring to an implied contract rather than an orally expressed one.

The law is well settled in Wisconsin that by the conduct and words of the parties the court can imply a contract. See *Wojahn v. National Union Bank* (1911), 144 Wis. 646, 667, 129 N. W. 1068; *Hooper v. O. M. Corwin Co.* (1929), 199 Wis. 139, 144, 225 N. W. 822. See also Restatement, 1 Contracts, p. 27, sec. 21, comment *a*; 1 Williston, Contracts (3d ed.), p. 49, sec. 22A. Therefore, the finding of the trial court must be sustained that there was an implied exclusive distributorship based upon sufficient consideration unless it is against the great weight and clear preponderance of the evidence.

The record shows that in 1945 the Peckarsky Companies and the Association began directly to undertake their marketing relationship. At that time the Peckarsky Companies, although newly organized, were well known to the Association, for the Association had conducted business with them when they were part of the Wisconsin Liquor Company. The Peckarsky Companies had established facilities, per-

sonnel, and a market for the Association's product as well as a defined territory in which it operated. The Association, on the other hand, also had an established business and had marketed their products in the territory in question with success in previous years. The Association at that time was interested in marketing their products in the Peckarsky territory due to the split between the Peckarsky family and the Pokrass family. Although it is not known whether there was any express contract arising from the 1945 meeting or subsequent meetings between the Association and the Peckarsky Companies, the following undisputed facts occurred:

From 1945 until February, 1959, the Peckarsky Companies were the only distributors of the Association, and with respect to Aristocrat brandy, they promoted and sold it to the virtual exclusion of other brandy handled. In their promotion and sale, they used and maintained their facilities, serviced the territory, retained inventories, and performed other functions with respect to the Association's product normally found in exclusive distributor contracts. In return, the Association promoted its products by extensive advertising and benefits to the Peckarsky salesmen. The record shows that there were incidents in which the Association policed the Peckarsky territory by having salesmen from other distributors selling its product removed from the Peckarsky area. In 1947, the Association authorized advertisements to be placed in a number of newspapers in Wisconsin cities describing the Peckarsky Companies as its exclusive distributor of Aristocrat brandy. Upon that authorization the Peckarsky Companies placed such advertisements. In a letter written by Perelli-Minetti, in 1957, the Association recognized that the Peckarsky Companies were the exclusive distributors and that these arrangements would be enforced.

As a result of the promotions by both parties and the use of the Peckarsky facilities, the Aristocrat brandy increased in annual sales from 6,191 cases in 1947 to 33,315 cases in 1960. Until the termination of relations, the Peckarsky Companies were the leading distributors in Aristocrat brandy in the entire United States in absolute volume.

We conclude that in view of these undisputed facts the finding of the trial court that there was an implied exclusive distributorship based upon the implied promises of the Peckarsky Companies to promote and sell the Association's products, to provide and maintain adequate warehousing and clerical facilities for the servicing of the territories, and to carry an adequate inventory in return for an exclusive distributorship with effective policing is not against the great weight and clear preponderance of the evidence. Therefore, we sustain the court's finding that there was an implied exclusive distributorship and that there was mutuality of obligation existing between the two parties.

### (2) *Termination and Reasonable Notice.*

The nature of an exclusive distributorship arrangement is one of continuation rather than one of several separate individual buy-and-sell agreements. However, in the present case there was no provision regarding the duration or termination of the exclusive arrangement. In the early case of *Irish v. Dean* (1876), 39 Wis. 562, we recognized the rule that an agency contract was not invalid if it did not provide for any termination date or designate a specific notice period:

"The true rule, we think, is this: In a contract for personal services, or for the sale of personal property to be delivered from time to time, if the contract is silent as to its duration, either party may terminate it at pleasure by giving

reasonable notice to the other party of his intention to terminate it." *Irish v. Dean, supra,* page 568.

This case was followed in *Voechting v. Grau* (1882), 55 Wis. 312, 317, 13 N. W. 230. Although there are some decisions to the contrary, *Joliet Bottling Co. v. Joliet Citizens' Brewing Co.* (1912), 254 Ill. 215, 98 N. E. 263, 265; *Curtiss Candy Co. v. Silberman* (6th Cir. 1930), 45 Fed. (2d) 451, 453, recent authorities hold that an exclusive distributorship contract having no provisions concerning termination can be terminated only after the giving of reasonable notice. *J. C. Millett Co. v. Park & Tilford Distillers Corp., supra,* page 493; *Hunt Foods v. Phillips, supra,* page 30. In the *Millett Case,* the facts of which are strikingly similar to those before us, the court stated in answer to the contention that an indefinite distributorship contract is terminable at will without notice because it is merely a contract of employment (p. 493):

"The agency aspects of the distributorship contract required Millett to use its corporate best efforts to promote the sale of Park & Tilford products and to sell such products to the retail market. But in addition Millett agreed to and did buy Park & Tilford products, took title to them and thus assumed the risk of their destruction, maintained warehouse facilities and tied up a substantial amount of its capital in inventory and accounts receivable. While these functions are related to the services to be rendered they are not the aspects of the distributorship contract which are properly called agency. Factually, the agreement was an integrated whole. But for purposes of determining the applicability of the Speegle case the agency character of the relationship must be separated from its sales character. In my opinion the non-agency undertakings are sufficient additional consideration.

"[9] I conclude that the distributorship contract indefinite as to time could be terminated by either party only after a reasonable time by giving prior reasonable notice."

Professor Williston discusses the same point and comes to the following conclusion:

"(3) Where the agreement contains no provision whatever for its termination.

"Quite properly this has been held an enforceable executory contract, binding upon each party for a reasonable time. It is the settled law of agency that if the agent or employee furnishes a consideration in addition to his mere services, he is deemed to have purchased the employment for at least a reasonable period where the duration of the employment is not otherwise defined. A similar result should be reached though the dealer is a buyer-distributor rather than a technical agent, where in addition to undertaking to pay for the manufacturer's products as ordered, he promises to establish or maintain adequate sales and demonstration facilities or to provide a maintenance and repair service for handling said products." 4 Williston, Contracts (rev. ed.), p. 2852, sec. 1027A.

The Association contends that the *Millett Case* is not applicable because it does not involve an exclusive distribution contract. This factual distinction does not destroy the applicability of the principles enunciated in that case. From the standpoint of the parties to an exclusive distributorship contract the factual necessity for requiring reasonable notice is greatly enhanced. The manufacturer should receive reasonable notice of termination in order to locate another distributor in the area for his products or to seek other arrangements; the distributor should have reasonable notice in order to make the transition from an exclusive distributor to a nonexclusive distributor or to conduct other transactions relative to his business.

Therefore, under the facts of the present case, before the Association could terminate the exclusive distributorship it had to give reasonable notice to the Peckarsky Companies.

Due to the complexity of the nature of the business of the Peckarsky Companies and their relation to the Associa-

tion the record contains much conflicting evidence as to what would be reasonable notice. After hearing all the testimony regarding this question and examining the record, the trial court found that sixty days' notice was reasonable. The trial court's finding was based upon the facts and circumstances of this business relationship and must be sustained.

The trial court found that the Association did not have sufficient cause to terminate the exclusive distributorship of Sheboygan-Badger Liquor Company and that the appointment of a dual distributor, Imperial Distributing Company, on March 17, 1959, for that territory without sixty-day notice breached and terminated the exclusive distributorship in that area. The trial court made similar findings with respect to the breach and termination of the exclusive distributors by the Association: September 1, 1960, the appointment of the Imperial Distributing Company in the Fond du Lac and Manitowoc territories; May 9, 1961, the appointment of the Gateway Liquor Company in the remaining areas. The trial court found that when the exclusive distributorships were breached and terminated, the Peckarsky Companies still were distributors, although nonexclusive, until July 31, 1961, at which time all relations between the companies ceased. The termination of the nonexclusive distribution contracts on July 31, 1961, by the Association were found to be for cause for the Peckarsky Companies had stopped payment on a check for $90,028.44 for a shipment of products.

Counsel for both parties in their briefs and in their oral arguments have endlessly argued on the various facts and the inferences which can be drawn therefrom supporting or opposing these findings of the learned trial court. But the findings are not against the great weight and clear preponderance of the evidence and cannot be disturbed.

The Peckarsky Companies argue that the appointment of the dual distributors by the Association without prior reasonable notice on the respective dates was a breach of the respective exclusive distributorship agreements but it did not terminate the agreement and instead constituted a continuing breach until July 31, 1961. We cannot agree with this contention. The exclusive distribution contracts were implied from the conduct of the parties and could be terminated at will provided there was reasonable notice. If the Association had given sixty days' notice before termination in each case it would not have been liable for a breach. The appointment of the dual distributors itself under the circumstances of this case was sufficient notice that the exclusive distributorship agreement was terminated and the breach continued to run only for the period of reasonable notice.

In support of their contention that the exclusive distributorship did not terminate at breach, counsel for the Peckarsky Companies cite the cases of *E. L. Husting Co. v. Coca Cola Co.* (1931), 205 Wis. 356, 237 N. W. 85, 238 N. W. 626, and *Hansen v. Taylor Beverage & Candy Co.* (1938), 227 Wis. 140, 277 N. W. 115. These cases are readily distinguishable because they involve written franchises which expressly covered the provisions of duration, and in those cases there was no cause for the termination, so the contracts continued to run. In the case before us the exclusive distributorship contract could be terminated at will, and the breach was the failure to give reasonable notice and termination occurred after the expiration of the time for reasonable notice.

The Association contends that by continuing to purchase its product after notification of the termination of the exclusive contract by the appointment of the respective dual distributors the Peckarsky Companies waived the breach.

In support of this contention it relies on *Curtiss Candy Co. v. Silberman, supra; Flint v. Youngstown Sheet & Tube Co.* (2d Cir. 1944), 143 Fed. (2d) 923; and *International Shoe Co. v. Waldron* (1940), 200 Ark. 345, 138 S. W. (2d) 1046. None of these cases are applicable to the present case because there are fundamental factual distinctions. In the *Silberman Case* the court held there was no enforceable exclusive distribution contract because it lacked mutuality and, consequently, the distributor had no rights accruing thereunder. In the *Flint Case* this precise question was not raised. An examination of the facts in the *International Shoe Co. Case* and the holdings of the court are substantially different from those before us. In that case the relationship was merely that of a shoe-sales agency and existed only for about one year before it was terminated. The distributor complained when it discovered that another distributor in the area was appointed but it then continued to order more shoes. The court was not convinced there actually was a binding contract in the first instance and held that even if there had been, this conduct by the distributor was a waiver of the breach. However, in the present case the relationship had existed for more than thirteen years. When a dual distributor in a territory was appointed the Peckarsky Companies violently protested and demanded that the dual distributor be removed. There are other acts of the Peckarsky Companies which show that they did not in any way acquiesce in the appointment of the dual distributor. Therefore, the ordering of more products did not constitute a waiver of the breach.

### (3) *Damages.*

In regard to the damages for breach of the exclusive distributorship agreements in the three respective Peckarsky

territories, the learned trial court made numerous findings of fact and held that the measure of damages would be the prospective margin on sales each company would have been entitled for the sixty-day period following the breach and termination. The final amount of damages was arrived at by first determining what the estimated average margin for each sale was, plus commissions, for the sixty-day period minus the actual average margin received by each of the three Peckarsky Companies. The trial court based all of its calculations on the results of extensive audits of the companies and other records showing the amount of average margin and actual margin. Based on these calculations the trial court found the respective Peckarsky Companies were entitled to the following amounts of damages: Sheboygan-Badger Liquor Company, $294.34, together with costs; Wisconsin Liquor Company of Green Bay, $605.10; Wisconsin Liquor Company of Oshkosh, $2,922.61.

We have previously held in this case that the trial court's finding that the sixty-day notice for termination was reasonable and must be sustained. We held that the appointment of the dual distributors in the respective territories under the facts of this case was notice by the Association of termination and that the exclusive contract terminated sixty days after the breach. We also sustained the trial court's finding that the nonexclusive contract was terminated for cause. Therefore, in reviewing the trial court's measure and calculation of damages we are concerned only with the factors used in arriving at the loss occurring during the sixty-day period following the notice of termination.

The Peckarsky Companies contend by their appeal that in addition to amount of damages arrived at by the trial court they are entitled to the following amounts: (1) Additional discounts they were obligated to give their customers in order to compete with the dual distributor; (2) discounts they were competitively obliged to give in other portions of their exclusive territory not yet invaded by dual

distributors. These two additional factors cannot be recognized as elements of damages for the first one was a factor in computing the actual margin during the sixty-day period and the second one is not directly related to a breach in areas not already invaded.

The Peckarsky Companies contend they are entitled to the profits earned by the dual distributor during the sixty-day period. We cannot allow this amount for it is not recognized as an element of damages and is clearly outside the scope of calculating estimated and actual margins.

Therefore, the measure and calculations of the trial court with respect to the damages resulting from the breach by the Association were correct and should be sustained.

### (4) *Interest on Liquidated Debt.*

Two actions in the present appeal were commenced by the Association for payment of merchandise purchased by the Wisconsin Liquor Company of Green Bay for $125,597, and by the Wisconsin Liquor Company of Oshkosh for $181,465.35. The two liquor companies denied liability for that amount but admitted liability for lesser amounts of $122,767.95 and $175,231.07 as a result of credits due them on the merchandise purchased. Prior to trial these parties stipulated that the final amounts owed to the Association for the merchandise were $124,097 and $178,132.35, respectively, plus interest and costs which the parties would compute later. However, no interest was computed on these amounts in the memorandum decision. After hearing the arguments of counsel and reviewing their briefs relative to this issue, the trial court by a supplemental opinion amended its previous order and allowed interest on these amounts at the rate of five percent and computed from forty-five days after the goods were received.

The Peckarsky Companies now contend that these amounts consisted of the respective sums due in payment of

merchandise after deducting certain credits as stipulated on February 20, 1962. They argue that the claims of the Association forty-five days after the receipt of the goods were unliquidated and no interest was allowable because these amounts were not known at that time, for the credits due the Peckarsky Companies on the merchandise had not yet been determined.

We have held that before interest can be recovered the amount claimed must be fixed or determined or readily determinable. *Maslow Cooperage Corp. v. Weeks Pickle Co.* (1955), 270 Wis. 179, 192, 70 N. W. (2d) 577. See *Necedah Mfg. Corp. v. Juneau County* (1932), 206 Wis. 316, 334, 237 N. W. 277. The parties in the present case did not dispute the initial amounts claimed by the Association for the merchandise purchased but they adjusted this amount by their stipulation to allow for certain credits presumably as a setoff. The existence of a setoff, counterclaim, or cross claim, although itself unliquidated, will not prevent the recovery of interest on the balance of the demand found due from the time it became due. *Maslow Cooperage Corp. v. Weeks Pickle Co., supra,* page 193. The trial court apparently found that from the business records on these transactions payment on the merchandise was due forty-five days after receipt; a contrary finding would not support the judgment. At that time the Peckarsky Companies could have tendered payment in order to stop interest from running. Therefore, the trial court did not err in allowing interest on these amounts computed forty-five days after the merchandise was received.

### (5) Costs.

The appellants' appeals relate to the measurement and amount of damages. On these issues appellants are the losing party. Respondent's motion to review relates to the contention that there were no implied contracts between the

parties nor any breach thereof. On these issues respondent lost. Each party submitted briefs exceeding 50 pages and each has asked to tax costs for its entire brief. Each party's brief is largely devoted to the issues on which that party was defeated and should not be awarded costs for presenting the contentions on which it did not succeed. These contentions are so large a part of the respective briefs and so interwoven with the remainder of such briefs that under the circumstances we have determined that no costs should be awarded to any party.

*By the Court.*—Judgments affirmed. Motion to review denied. No costs to be taxed by any party against its opponent.

HALLOWS, DIETERICH, and GORDON, JJ. (*dissenting*). We respectfully dissent from that portion of the judgment which limits the distributor to damages for a period of sixty days after the California Wine Association terminated the exclusive character of the agency.

The contract between the parties did not spell out the mechanics for terminating the exclusive distributorship. Under such circumstances, the law requires that a reasonable period of time elapse between the notice of termination and the actual end of the exclusive distributorship. *Milwaukee v. West Allis* (1935), 217 Wis. 614, 618, 258 N. W. 851; *Voechting v. Grau* (1882), 55 Wis. 312, 317, 13 N. W. 230; *Irish v. Dean* (1876), 39 Wis. 562, 568. The rule requiring reasonable notice in order to terminate a distributorship has more recently been upheld in *J. C. Millett Co. v. Park & Tilford Distillers Corp.* (D. C. Cal. 1954), 123 Fed. Supp. 484, 493. See also 4 Williston, Contracts (rev. ed.), p. 2852, sec. 1027A.

For an extended period of time (in excess of thirteen years) the Peckarsky Companies enjoyed an exclusive distributorship. Through their own efforts, they created the

134

broad acceptance which had been obtained for the manufacturer's product. For these reasons we consider that the trial court erred in fixing only sixty days as a reasonable period of notice for termination.

We consider that in this regard the damages found by the trial court for the several Peckarsky Companies are inadequate, and we would favor remanding the case for a redetermination of the damages based upon a longer period of notice. It would seem to us that the trial judge might well have fixed the period at six months; in any event, his setting the period at sixty days was inadequate.