NORTHWESTERN NATIONAL INSURANCE COMPANY, a Wisconsin insurance company, and Northwestern National Casualty Company, a Wisconsin insurance company, Plaintiffs,

v.

MARSH & McLENNAN, INCORPORATED, a Delaware corporation, Marsh & McLennan of Louisiana, Inc., a Louisiana corporation, Reliable Insurance of Louisiana, Inc., a Louisiana corporation, and M. Glynn Sutton, an individual, Defendants.

Civ. A. No. 89-C-371.

United States District Court,
E.D. Wisconsin.

April 5, 1993.

Richard C. Ninneman, P. Jeffrey Archibald, Quarles & Brady, Milwaukee, WI and Stephen D. Straus, Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, for plaintiffs.

Anne Willis Reed and Ann Morgan Hlavacka, Reinhart, Boerner, Ven Deuren, Norris & Rieselbach, Milwaukee, WI, for Marsh & McLennan and M. Glynn Sutton.

Thomas R. Schrimpf, Hinshaw & Culbertson, Milwaukee, WI, for Reliable Ins. and M. Glynn Sutton.

**1426**

## DECISION AND ORDER

REYNOLDS, Senior District Judge.

In this action, filed March 31, 1989, plaintiffs Northwestern National Insurance Company and Northwestern National Casualty Company (collectively, "Northwestern") claim that defendants M. Glynn Sutton ("Sutton"), Reliable Insurance of Louisiana, Inc., ("Reliable"), and Marsh & McLennan, Incorporated, and Marsh & McLennan of Louisiana, Inc., (collectively, "Marsh & McLennan") breached their contractual obligations to procure complete "reinsurance" for Northwestern and misrepresented that complete reinsurance would be procured. On April 3, 1992, Sutton and Reliable filed a motion for summary judgment. The remaining defendants joined in that motion on April 29, 1992. An additional motion for summary judgment was filed on November 13, 1992, by Sutton and Marsh & McLennan. Northwestern moved for summary judgment on July 20, 1992.

For reasons stated below, defendants first motion is granted in with respect to the misrepresentation claims and denied with respect to the contract claims. The subsequent motion filed by Sutton and Marsh & McLennan is denied, and the motion filed by Northwestern is granted with respect to the liability component of the contract claim and denied in all other respects.

Jurisdiction in this court is based upon 28 U.S.C. § 1332(a)(3). Northwestern is a Wisconsin insurance company. Marsh & McLennan is a Delaware corporation with its principal place of business in New York. Reliable is incorporated and principally operated in Louisiana, and Sutton is a citizen of that state. Northwestern claims an amount in controversy in excess of $50,000.

## FACTS

This case arises out of the efforts of the Great Lakes Chemical Corporation ("Great Lakes") to self-insure.[1] Its ability to do so was complicated somewhat by state statutes requiring companies of its size to obtain insurance from licensed insurers. To comply with these statutes, and yet at the same time take advantage of self-insurance, Great Lakes resorted to a not uncommon scheme known as insurance "fronting." A front is established when a licensed carrier issues a policy to a company and the company promises, in return, to assume whatever risk the carrier has assumed under the policy or to reimburse the carrier for whatever amounts it is required to pay out under the policy. In addition, the company agrees to pay the carrier a fronting service fee far below the cost of an actual insurance premium.

In this case, Northwestern, a licensed insurer in every state, agreed to act as Great Lakes' fronting carrier. All was well during the first and fourth years of this arrangement (covering the periods from April 1, 1982, to April 1, 1983, and from April 1, 1985, to April 1, 1986, respectively), when the Niagara Insurance Company ("Niagara"), a wholly-owned subsidiary of Great Lakes, agreed to "reinsure" Northwestern for the entire risk it assumed in insuring Great Lakes.[2] In the second and third years, however, Niagara complicated the arrangement by reinsuring only the first $100,000 of Northwestern's potential liability. Responsibility for insuring the remainder of that liability was to be "retroceded" to the Republic Insurance Company ("Republic").[3] It was in that transaction, the retrocession, that something apparently went wrong.

Specifically, because of the way the Republic policies were written, they did not cover Northwestern to the same extent Northwestern's policies covered Great Lakes. Under the Great Lakes policy for year two—the only year for which Northwestern now seeks damages—Northwestern was required to pay up to $500,000 in claims against Great Lakes and was, in addition, required to assume whatever "loss adjustment expenses" or "de-

---

**1.** Great Lakes, incorporated in Delaware and principally operated in Indiana, was dismissed from this action by stipulation.

**2.** Niagara, a Cayman Islands insurance company, was dismissed from this action by stipulation.

**3.** Republic, incorporated in Delaware and principally operated in Texas, was dismissed from this action by stipulation.

fense costs" were associated with resolving those claims. Thus, the total costs to Northwestern could, and did, rise well above $500,000. In contrast, the policies issued in year two by Republic and Niagara, which were supposed to cover Northwestern to the full extent of its liability, instead only provided coverage up to the $500,000 limit. The defense costs Northwestern incurred beyond that limit were not covered.

The remaining individual defendant, Sutton, is the broker who, according to Northwestern, promised but failed to procure reinsurance that would cover all costs, including all defense costs, incurred by Northwestern in connection with the Great Lakes policy. The other defendants, Marsh & McLennan and Reliable, are the brokerage firms with which Sutton was associated at relevant times. Again, Northwestern seeks damages from these defendants only with respect to the defense costs it incurred for year two of the fronting program.

Sutton, together with Theodore Knott, the director of both Niagara and its predecessor corporation, designed the Great Lakes fronting plan in the late 1970s.[4] In 1981, Sutton, then employed by Marsh & McLennan, sought and eventually obtained Northwestern's agreement to act as the fronting carrier. In a March 31, 1982 letter from Northwestern's Lexy Ozols ("Ozols") to Robert Richards, a Marsh & McLennan employee, Ozols quotes Northwestern's proposed commission for the Great Lakes arrangement and states: "As you know, we must have acceptable reinsurance ... to the policy limits. It is my understanding that you will be placing the reinsurance." (Pl.'s Ex. J.) As noted above, Niagara supplied the requested reinsurance for the first year of the fronting arrangement.

In March 1983, near the close of the fronting arrangement's first year, Sutton proposed renewing it for another year, covering the period from April 1, 1983, to April 1, 1984. Under the renewal proposal, Niagara would continue to reinsure Northwestern up to Northwestern's $500,000 indemnity limit. (Northwestern Proposed Facts at ¶ 16; Sutton Response to Northwestern Proposed Facts at ¶ 1.)

On April 28, 1983, however, Niagara informed Sutton that it had adjusted its reinsurance obligations; rather than reinsure Northwestern to the extent of Northwestern's indemnity limit, as it had the previous year, Niagara now would reinsure only the first $100,000 of Northwestern's liability and would retrocede the balance of its reinsurance obligation to another company, which turned out to be Republic. (Northwestern Ex. P.) In his letter informing Sutton of this proposed change, Knott states, "[a]s soon as I have received the contract [between Niagara and Republic], I will forward it to you so that you may review it on behalf of Northwestern." (Id.)

Sutton first informed Northwestern of Niagara's retrocession plan on June 15, 1983, more than two months after the second year of the fronting arrangement began. (Northwestern Ex. Q; Northwestern Proposed Facts at ¶ 17; Sutton Response to Northwestern Proposed Facts at ¶ 2.[5]). Sutton's letter of that date informs Northwestern, "[i]t would appear [that the insurance issued by Republic to Niagara] could be drawn in favor of Northwestern National and the reinsurance agreement [between Northwestern and Niagara] amended accordingly." The letter closes, "[p]lease give this matter some thought and favor us with your advice." (Northwestern Ex. Q.) In a June 30, 1983 letter to Sutton, Ozols, of Northwestern, confirms an arrangement, retroactive to April 1, 1983, whereby Republic would provide "direct reinsurance" to Northwestern of up to $400,000 in excess of the $100,000 of reinsurance provided by Niagara. (Northwestern Ex. R.)

Sutton did not give Northwestern a copy of the Republic–Niagara policy until August 22, 1983, almost five months after the second year of the fronting arrangement began. In an accompanying letter, Sutton outlines sev-

---

4. Knott, an Ohio citizen, was dismissed from this action for lack of personal jurisdiction.

5. Sutton asks the court to disregard this factual statement on the ground that is irrelevant. Sutton does not, however, challenge the accuracy of the statement.

eral problems with the policy, including its lack of any provision entitling Northwestern to reimbursement for defense costs. Sutton states that, absent such a provision, it is necessary to specify Northwestern's "ultimate net loss" and to obtain "excess umbrella" insurance covering the difference between the net loss ceiling and Northwestern's indemnity limit. Sutton's letter closes with: "After you have had an opportunity to evaluate this policy, let's discuss it further and reassess the situation." (Northwestern Ex. S.).

In follow-up correspondence dated August 29, 1983, Sutton provided Ozols with a proposed amendment to the policies then in effect that would cap Northwestern's ultimate net loss at $500,000, including defense costs. The amendment states:

> Amounts paid or incurred by [Northwestern] pursuant to the obligation to defend or pay the costs and expenses of such defense are included within, and not in addition to, the [$500,000 liability limit].

(Northwestern Ex. GG.) In a letter accompanying the proposed amendment, Sutton states, "[w]e do not believe there will be any objection" from Republic, and further states, "[w]e will address the issue" of obtaining the necessary amendments to the Republic policies. (Id.)

In Ozols' September 6, 1983 response to Sutton's proposal, she states:

> I have ... reviewed your preliminary endorsement which amends the policies to provide coverage with an ultimate net loss of $500,000 including defense. Although I don't anticipate any problems, we will have to run the endorsement by our legal department for their approval on the wording.
>
> Also, before we can endorse our policies we will need written confirmation from Republic that they will follow form....
>
> Finally, I would like to suggest that you run this endorsement past the umbrella carrier since their attachment point will be lower and all of the policies should have uniformity of limits.

(Northwestern Ex. Z.)

Sutton's proposed amendment was never put into effect.

In the fall of 1983, Sutton left Marsh & McLennan, taking the Great Lakes account with him, and formed Reliable. About a year later, on November 1, 1984, Reliable and Northwestern entered into an agreement, retroactive to November 1, 1983, appointing Reliable as Northwestern's "General Agent ... for all lines." (Northwest Ex. C.) The agreement sets forth Reliable's authority to write insurance policies on behalf of Northwestern, provides for the payment of a commission to Reliable, and obligates Reliable to "use its best efforts to promote the interest of [Northwestern] and ... perform all acts necessary to the proper conduct of the business and for the protection of [Northwestern's] interest." (Id.)

In a November 9, 1983 letter to Sutton, Marsh & McLennan assistant vice-president Michael Graham ("Graham") acknowledges that Sutton and Reliable became Northwestern's "broker-of-record effective 11/1/83" and were "now responsible for all service on the [Northwestern] account." (Marsh & McLennan Ex. C.) Graham further explains that "Marsh & McLennan will conclude final audit for the 4/1/82–83 period, as well as any pending endorsement requests." (Id.).

On March 2, 1984, Sutton proposed renewing the Great Lakes insurance front for a third year, covering the period from April 1, 1984, to April 1, 1985. (Northwestern Ex. T.) In his letter outlining the terms of the renewal, Sutton states that Northwestern's policy limit would be increased from $500,000 to $1 million, that Niagara would reinsure the first $100,000 of Northwestern's policy limit, and that "Republic will reinsure both Niagara and [Northwestern] for $900,000 excess of $100,000." (Id.) The letter continues, "[y]ou are aware of the arrangement, however we still need to satisfy ourselves with regard to policy construction of the facultative reinsurance certificate." (Id.) "Facultative reinsurance" was the term used to refer to the excess reinsurance provided by Republic.

In a March 9, 1984 letter to Sutton, Ozols confirms the renewal proposal on behalf of Northwestern but states that Republic's excess reinsurance policy must be issued in

favor of "Northwestern National and not Niagara." (Northwest Ex. U.) On May 11, 1984, Sutton informed Northwestern that he had obtained the reinsurance from Republic, that "Northwestern National is the reinsured," and that the reinsurance would be issued in two separate policies. (Northwest Ex. V.) Sutton delivered these policies to Northwestern on October 23, 1984, and November 25, 1986, respectively, well after the start of the fronting year to which they were applicable (April 1, 1984, to April 1, 1985). (Northwestern Proposed Facts at ¶ 25; Sutton Response to Northwestern Proposed Facts at ¶ 2.[6]) Contrary to Ozols' instructions, the policies listed both Northwestern and Niagara as the reinsureds.[7] (Id.)

The fronting arrangement was renewed for a fourth and final year, covering the period from April 1, 1985, to April 1, 1986, but the circumstances surrounding the renewal are not set forth in the record. The effect of the renewal was to reduce Northwestern's indemnity limit from $1 million to $500,000, and to increase Niagara's reinsurance obligation from $100,000 to $500,000, thus eliminating the previous coverage gap. (Compl., Ex. B at Schedule A.)

In a March 5, 1985 letter to Sutton, Ozols reiterates her concern that the Republic policies for years two and three be corrected to make clear that Republic was providing direct reinsurance to Northwestern, rather than to Niagara. (Northwestern Ex. KK.) Sutton responded, "I have followed up on the corrections requested in your March 5 letter and inquired as to whether or not we can expect to receive the corrections by June 1." (Northwestern Ex. II.)

On August 15, 1985, Ozols and Sutton met in Milwaukee to discuss various unresolved issues with respect to Northwestern's coverage under the reinsurance policies. Northwestern claims that the problem of reimbursement for defense costs was among the issues discussed. (Northwestern Proposed Facts at ¶ 27.) Sutton says he does not remember whether that topic was discussed or not. (Sutton Response to Northwestern Proposed Facts at ¶ 7.) On December 10, 1985, Ozols complained that many of the items discussed at the August meeting, including the necessary "corrections to Republic's policies" for the second and third years of the fronting program, were still unresolved. (Northwestern Ex. BB.) Ozols' letter does not specifically refer to the defense costs problem.

Sutton responded to Ozols on December 15, informing her that he had been waiting for her to reply to an earlier letter from Republic's broker. (Northwestern Ex. CC.) Sutton states, "I will have to check into the matter and clear all of the outstanding suspense and resolve the issues to your satisfaction." (Id.)

In a November 25, 1986 letter, Ozols again asks Sutton to resolve the outstanding issues concerning years two and three. (Northwestern Ex. X.) That letter prompted a January 29, 1987 letter from Sutton to Knott, Republic's broker, containing the following request: "[I]t would be beneficial if we could prepare an overview of the Republic policies and be certain they are properly drafted so as to negate any liability not assumed by Niagara." (Northwestern Ex. Sutton 137.)

That, however, did not happen. Northwestern ended up incurring substantial claims and defense costs during year two that Niagara and Republic refused to reimburse. Had Northwestern anticipated the possibility of incurring such costs, it would have required Great Lakes to pay an appropriate insurance premium, rather than a mere fronting fee. Sutton was aware that Northwestern went into the fronting program on the assumption that it would not be at risk. (Northwestern Proposed Facts at ¶ 31; Sutton Response to Northwestern Proposed Facts at ¶ 2.[8])

This factual information is reiterated and supplemented to some extent below.

---

6. Please see note 5.

7. This issue of whether Republic's policies were supposed to reinsure Northwestern, as opposed to Niagara, comes up frequently in the parties' correspondence. How that issue bears on the defense costs problem, however, is unclear.

8. Please see note 5.

## 1430

### ANALYSIS

 The court must grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, admissions, and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment has the initial burden of asserting the absence of any dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). To withstand summary judgment, however, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). The court must draw all reasonable inferences from the record in favor of the nonmoving party. *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir.1989).

The court will consider the misrepresentation and contract claims in turn.

### I. Misrepresentation Claims

 In challenging these claims, defendants contend that they never told Northwestern that complete reinsurance had been obtained, and that, even if they had made such a statement, Northwestern could not have reasonably relied upon it.[9] The representation at issue in this claim is the statement in Sutton's August 29, 1983 letter that "[t]he Republic policy will require amendatory endorsements [to resolve the defense costs problem] and we [i.e., Marsh & McLennan] will address the issue." (Northwestern Ex. GG.) Sutton said something similar, though less precise, in his December 15, 1985 letter, where he promised "to check into the matter and clear all of the outstanding suspense and resolve the issues to your satisfaction." (Northwestern Ex. CC.)

The court concludes that neither of these representations, nor any of the other less significant statements identified by North-

western, support a claim for misrepresentation. The problem is that each of the statements relates to events that might have occurred in the future; none of the statements refers to any "pre-existing fact." As a result, it is necessary for Northwestern to show that Sutton "knew of facts incompatible" with his statements at the time he made them. *Lundin v. Shimanski*, 124 Wis.2d 175, 194, 368 N.W.2d 676 (1985). Northwestern, however, has not attempted to make such a showing, and the record does not indicate that Sutton thought he could not obtain the amendments he proposed obtaining.

Thus, defendants are entitled to summary judgment on the misrepresentation claim.

### II. Contract Claims

Each defendant contends that a contract obligating Sutton to procure complete reinsurance for Northwestern was never formed and that, even if such a contract was formed, Northwestern waived it or is estopped from asserting it. Marsh & McLennan claims, in addition, that if such a contract was formed and is enforceable, it does not bind Marsh & McLennan, because Reliable was substituted for Marsh & McLennan as the obligor under the contract. And Reliable claims (as of oral argument) that if such a contract was formed and is enforceable it does not bind Reliable, because the contract had to have been formed when Sutton was at Marsh & McLennan, prior to Reliable's creation.

It was agreed at oral argument that the facts critical to the contract claims are not in dispute, although their legal significance is hotly debated. The court, therefore, may proceed to determine on the basis of the record whether Sutton was contractually bound to procure complete reinsurance, including coverage for defense costs, for Northwestern.[10]

---

9. Defendants also insist that Louisiana law governs the misrepresentation claims and that, therefore, the strict liability claim must be dismissed because Louisiana does not recognize it, and both misrepresentation claims must be dismissed because they are barred by Louisiana's one-year statute of limitations. The court need not address these arguments, since it disposes of the misrepresentation claims on other grounds.

10. Sutton is sued in his capacity as agent of Marsh & McLennan and Reliable. (Compl. at ¶ 9.) Thus, any reference to Sutton's contractual obligation's is a reference not to his personal obligations, but to the obligations he incurred on behalf of one or both of the companies.

## A. Existence of the Contract

There is no doubt that a contractual relationship of some kind existed between Sutton and Northwestern. For their work on Northwestern's behalf, Sutton and the other defendants received a commission that was deducted from the fronting fee paid Northwestern. The problem, however, is that Sutton's contractual obligations were never expressly defined. Northwestern says Sutton assumed responsibility not only for making recommendations with respect to reinsurance, but also for finally implementing those recommendations. Sutton maintains, by contrast, that his job was merely to advise and, perhaps, to intermediate; Northwestern was ultimately responsible for obtaining adequate reinsurance for itself.

■ Northwestern does not really claim that some particular correspondence or conversation established Sutton's obligation to procure complete reinsurance. The parties' sole express agreement is the agency agreement between Reliable and Northwestern, and that agreement speaks only in general terms; it does not identify Sutton's obligations with respect to the fronting arrangement. The extent of those obligations, however, is said to be proved by the parties' course of dealings. That method of proof is, of course, quite acceptable. *California Wine Ass'n v. Wisconsin Liquor Co.*, 20 Wis.2d 110, 122, 121 N.W.2d 308 (1963).

■ The court agrees that the parties' dealings establish the existence of a contract requiring Sutton to make sure Northwestern incurred no risk as a result of its role in the fronting arrangement. The undisputed facts show that Sutton designed the fronting program and solicited Northwestern's participation as a fronting carrier, recognizing that Northwestern expected to incur no risk. Further, throughout the parties' relationship, it was Sutton who acted both as the expert adviser and as the person responsible for implementing whatever advice he gave, as well as whatever concerns Northwestern raised on its own. In the typical case, Sutton would identify an issue of concern, propose a solution, request Northwestern's approval and comments, and then do what was necessary to resolve the issue accordingly. Northwestern dealt only with Sutton; if anything needed to be done on Northwestern's behalf, only Sutton could do it.

This mode of operation is revealed by the parties' correspondence during year two of the fronting program. In a June 15, 1983 letter to Ozols, Sutton informs Northwestern of the retrocession to Republic and explains how Northwestern would be affected by the Republic policy. (Northwestern Ex. Q.) On the basis of that letter and a subsequent telephone conversation, Ozols sent Sutton a letter confirming the arrangement, requesting Sutton to obtain the necessary documentation. (Northwestern Ex. R.)

In an August 22, 1983 letter to Ozols, Sutton identifies various issues raised by the Republic policy, including the questions of whom the policy should name as the insured, which Northwestern policy the Republic policy should reference, what endorsements should be attached to the Republic policy, and how to protect Northwestern from liability for defense costs; solutions to each of these questions were proposed. (Northwestern Ex. S.) In an August 29, 1983 letter to Ozols, Sutton pursues further the defense costs matter, proposing an amendment to Northwestern's policies that would eliminate liability for such costs beyond the indemnity limit and promising to "address the issue" of obtaining equivalent changes in the Republic policy. (Northwestern Ex. GG.) In a September 6, 1983 letter, Ozols accepts certain of the proposals contained in Sutton's August 22 letter and modifies others; with respect to the defense costs issue, Ozols approves of Sutton's proposed amendment, subject to its review by the Northwestern legal department. Ozols instructs Sutton to submit the amendment to the umbrella carrier and to obtain written confirmation that Republic will conform its policies to the amendment. (Northwestern Ex. Z.)

Correspondence concerning year three of the arrangement also exhibits the parties' understanding that Sutton was responsible for identifying and resolving any issues of concern to Northwestern. In early March 1984, Sutton sent Ozols letters explaining the terms of renewal for the year beginning

April 1, 1984, including a provision for claims handling by CU Risk Management (Northwestern Exs. T, V.) Ozols accepted the terms in a March 9 letter, which included an instruction · that Sutton negotiate a claims handling contract on behalf of Northwestern, subject to its final approval.[11] (Northwestern Ex. U.) In October 1984, Sutton sent Ozols copies of certain policies relevant to year three. In an attached letter, Sutton states, "you can advise me if there are any additional changes necessary." (Northwestern Ex. W.)

A third series of letters further indicates the existence of an obligation on Sutton's part to effectuate policy changes consistent with Northwestern's interests. In a March 5, 1985 letter, Ozols asks Sutton to obtain various corrections to the Republic policies ensuring that Republic reinsurance would run directly to Northwestern, rather than to Niagara. (Northwestern Ex. KK.) Sutton responded: "I have followed up on the corrections requested in the March 5 letter and inquired as to whether or not we can expect to receive the corrections by June 1." (Northwestern Ex. II.) In a December 10, 1985 letter to Sutton, Ozols identifies various unresolved issues that had been discussed at an August 15, 1985 meeting, including again the problem of obtaining corrections to the Republic policies.[12] (Northwestern Ex. BB.) In Sutton's response, he agrees "to check into the · matter ... and resolve the issues to your satisfaction." (Northwestern Ex. CC.)

Ozols expresses essentially the same concerns in a November 25, 1986 letter to Sutton. (Northwestern Ex. X.) Sutton apparently tried to address the concerns in a January 19, 1987 letter to Knott, Republic's broker. Sutton tells Knott, "it would be beneficial if we could prepare an overview of the Republic policies and be certain they are

properly drafted so as to negate any liability not assumed by Niagara." (Northwestern Ex. Sutton 137.)

All this correspondence demonstrates quite clearly that Northwestern paid Sutton not just to act as an adviser and a channel of communication, but also to take whatever steps were necessary to resolve issues of concern to Northwestern. It is undisputed that prominent among these was the need to ensure that Northwestern incurred no liability as a result of its participation in the front. Thus, when it turned out that developments in year two had created a coverage gap, leaving Northwestern potentially liable for defense costs incurred beyond its indemnity limit, Sutton was obligated to resolve the problem. His August 1983 correspondence to Ozols recognizes as much.

### B. Waiver and Estoppel

■ Defendants have pinned their case not so much on the position that a contract to procure complete reinsurance was never formed, but on the position that Northwestern waived or is estopped from asserting such a contract if it was formed. The theory is that Sutton's August 22 and 29, 1983 letters, as well as Northwestern's possession of all relevant policies, put Northwestern on notice of the defense costs problem. Possessed of such knowledge, Northwestern's failure to raise the issue in a timely manner, defendants contend, effectively discharged Sutton from his obligation to procure complete reinsurance.

Each of the cases defendants cite involves essentially the same scenario.[13] The obligee learns of the obligor's breach in year one and says nothing until year four or five, at which time the obligor refuses to perform. Held: the obligee, by its lengthy silence or inaction in the face of full knowledge of the breach,

---

11. The manner in which the parties dealt with the claims handling issue is merely illustrative of their relationship; the issue itself is unrelated to the defense costs problem.

12. As noted above, the parties do not agree as to whether defense costs were among the issues discussed at the meeting.

13. The cases include: *Dunn v. Pertzsch Constr. Co.*, 38 Wis.2d 433, 157 N.W.2d 652 (1968);

*Conners v. Chippewa Falls*, 228 Wis. 102, 279 N.W. 640 (1938); *Somers v. Germania Nat'l Bank*, 152 Wis. 210, 138 N.W. 713 (1913); *Voss v. Northwestern Nat'l Life Ins. Co.*, 137 Wis. 492, 118 N.W. 212 (1909); and similar cases from Louisiana. Since defendants say it does not matter whether Wisconsin or Louisiana law applies to the contract claim, the court has reviewed only Wisconsin law.

waived or acquiesced in or is estopped from asserting the breach at such a late date.

A sensible rule, to be sure, but not one terribly relevant here. There was absolutely nothing in Sutton's letters or in the various insurance policies to suggest that Sutton had breached his obligation to procure complete reinsurance. On the contrary, Sutton's letters express his willingness to continue to perform his contractual duties. He identifies the defense costs problem, drafts a proposed amendment that would solve the problem by capping Northwestern's net liability, and specifically undertakes to perform other tasks necessary to implement the solution. Ozols' responsive letter exhibits her understanding that Sutton will follow through. She asks him, among other things, to obtain Republic's written confirmation that it will adjust its policies in accordance with the proposed amendment.

It is true, as defendants pointed out in oral argument, that merely reconciling the Republic policy with the proposed amendment would not eliminate the coverage gap; that is because, under Sutton's proposal, Northwestern would protect itself by reducing its liability to Great Lakes, rather than by expanding Republic's liability to Northwestern. Nevertheless, it is clear from Ozols' request that she fully expected Sutton to continue performing his contractual obligations. Her expectation was supported not only by Sutton's letters, but also by the accepted practice in the reinsurance industry of amending policies after their issuance. (Dec. 28, 1992 Waterman Aff. at ¶ 5.)

A party does not waive or "intentionally relinquish" a right if the party lacks knowledge of any fact material to the waiver. *Mansfield v. Smith*, 88 Wis.2d 575, 592–93, 277 N.W.2d 740 (1979). In this case, Northwestern lacked knowledge of the material fact that the right in question—the right to expect continued performance from Sutton— was in jeopardy, for Sutton never refused to perform. So, Northwestern cannot have waived the right by mere silence or inaction. Similarly, Northwestern is not estopped from asserting its rights against Sutton unless its response to Sutton's letters "induced" Sutton to terminate his effort to obtain complete

reinsurance. *Kornitz v. Commonwealth Land Title Ins. Co.*, 81 Wis.2d 322, 331, 260 N.W.2d 680 (1978). But Northwestern's response cannot have induced any such reliance. On the contrary, as has been said, the response clearly indicated that Sutton was to follow through with his proposed amendment. Although Ozols stated that Northwestern's legal department would review the amendment, there was no suggestion that Sutton's obligations were suspended pending such review.

Thus, the court rejects the argument that Sutton was relieved of his contractual obligation to obtain complete reinsurance.

#### C. The Contract Claim Against Marsh & McLennan

Marsh & McLennan contends that it was relieved of any contractual obligation to Northwestern because Reliable was "substituted" for Marsh & McLennan as Northwestern's broker. In support of this defense, Marsh & McLennan cites its own correspondence to Sutton confirming that Reliable would become Northwestern's broker as of November 1, 1983. (Marsh & McLennan Ex. C.)

Substitution in the legal sense, however, requires much more than that. The previous obligor must show not just that it was relieved of any future duty to perform, but that it was relieved of all responsibility for past performance as well. The new contract must entirely displace the old. *Navine v. Peltier*, 48 Wis.2d 588, 591, 180 N.W.2d 613 (1970). In this case, Northwestern chose to use Reliable as its broker, rather than Marsh & McLennan, after November 1, 1983. But there is no indication that Northwestern, by signing up with Reliable, meant to discharge Marsh & McLennan from whatever obligations that company undertook prior to November 1, 1983. Indeed, Marsh & McLennan acknowledged that, despite its replacement by Reliable, it was still responsible for conducting an audit of year one of the fronting program and for finalizing any "pending endorsement requests." (Marsh & McLennan Ex. C.)

Because Northwestern never relieved Marsh & McLennan of its existing obli-

gations, but merely turned to Reliable for service after a certain date, Marsh & McLennan remains liable for whatever commitments to Northwestern it made and failed to meet, including the commitment to procure complete reinsurance.

### D. The Contract Claim Against Reliable

■ There is no doubt that Reliable, Sutton's company, shared Sutton's responsibility for protecting Northwestern's interests. Although the obligation was undertaken prior to Reliable's creation, it was, as Sutton recognized, a continuing obligation. Reliable, through Sutton, purported to service all aspects of the Northwestern account, including those stemming from policies issued during year two of the fronting arrangement, prior to Reliable's creation. (Northwestern Exs. CC, II, KK; Northwestern Ex. Sutton 137.) Reliable thus assumed all of Sutton's contractual obligations to Northwestern, including the obligation to procure complete reinsurance.

### III. Conclusion

For the foregoing reasons, the court will grant summary judgment for defendants with respect to the misrepresentation claims and for Northwestern with respect to the liability component of its contract claims. If the parties are unable to agree on an amount of damages, Northwestern will submit its proposed accounting and defendants will be given an opportunity to respond.

IT IS THEREFORE ORDERED that the summary judgment motion filed by defendants Sutton and Reliable on April 3, 1992, and joined by defendant Marsh & McLennan on April 29, 1992, is GRANTED with respect to plaintiff Northwestern's claims for misrepresentation and DENIED with respect to its claim for breach of contract.

IT IS FURTHER ORDERED that the summary judgment motion filed by defendants Sutton and Marsh & McLennan on November 13, 1992, is DENIED.

IT IS FURTHER ORDERED that the summary judgment motion filed by plaintiff Northwestern on July 20, 1992, is GRANTED with respect to defendants' liability for breach of contract and DENIED in all other respects.

IT IS FURTHER ORDERED that within 14 days from the date of this order either (1) the parties shall file a stipulation as to damages, or (2) in the absence of such a stipulation, Northwestern shall file its accounting. In the latter case, defendants shall respond to Northwestern's accounting within 7 days from the date it is filed.