CONGRESS BAR & RESTAURANT, INC., Respondent, v. TRANSAMERICA INSURANCE COMPANY and others, Appellants.

*No. 153. Argued February 5, 1969.—Decided March 7, 1969.*
(Also reported in 165 N. W. 2d 409.)

58

For the appellants there were briefs by *Kenneth M. Kenney* and *Wolfe, O'Leary, Kenney & Wolfe,* all of Milwaukee, and oral argument by *Kenneth M. Kenney.*

For the respondent there was a brief by *Ross, Stevens, Pick & Spohn,* attorneys, and *Frank A. Ross, Thomas D. Zilavy,* and *Richard C. Glesner* of counsel, all of Madison, and oral argument by *Mr. Zilavy.*

WILKIE, J.  Fundamentally, appellants attack the trial court for both an error in law in determining that under the policies the respondent is given "a choice" to rebuild, repair, or replace the property damaged in the fire, and an error in its factual determination that a period of eleven months was "necessary for the plaintiff to rebuild and restore the damaged premises." These are two of the three issues presented on this appeal. The third, raised by respondent's motion to review, is whether the respondent is entitled to prejudgment interest from the date of the fire.

*Policy Interpretation.*

The business-interruption endorsement attached to the insurance policies issued by the respective defendants limits the compensable period of business interruption to:

". . . such length of time as would be required with the exercise of due diligence and dispatch to *rebuild, repair or replace such part of the property . . . as has been damaged or destroyed,* commencing with the date of such damage or destruction . . . ." (Emphasis added.)

The policies further provide that the insured is covered against loss "resulting directly from *necessary* interruption of business caused by damage to or destruction of real or personal property . . . ." (Emphasis added.) This language is similar to that found in policies insuring against loss of rent. In those cases the courts have held that recovery is limited to the period within which the insured premises could be restored to their former condition.[1]

Black's Law Dictionary [2] defines "repair" as follows:

"To mend, remedy, restore, renovate, to restore to a sound or good state after decay, injury, dilapidation, or partial destruction."

"Replace" is defined by the same authority as:

"To place again, to restore to a former condition."

Funk & Wagnalls New Standard Dictionary [3] defines "rebuild" as follows:

"To build again or anew. Specif.: (1) To build a substitute for, after demolition or destruction. (2) To make extensive repairs or alterations in."

[1] *Syndicate Co. v. Insurance Co.* (1911), 85 Kan. 367, 116 Pac. 620; *Syndicate Co. v. Insurance Co.* (1913), 91 Kan. 67, 136 Pac. 941; *First Investment Co. v. Vulcan Underwriters Co.* (D. C. Or. 1927), 33 Fed. 2d 785.

[2] 4th ed., 1951, at page 1462.

[3] 1941, at page 2062.

Thus it appears that under the provisions of the insurance contract in question the insured is to be compensated for that period of time which with "due diligence and dispatch" the "damaged or destroyed" portions of the premises can be rebuilt, repaired or replaced.

The opinion of the trial court reads in part as follows:

"The defendants' position is based upon the premise that it was not necessary for the plaintiff to embark upon the course they took of demolition and new construction to get back in business and that instead it could have been done by the repair and restoration of the existing buildings. The real issue then is whether or not the policy required the plaintiff to resort to repair and restoration. This course was open to them, but they chose to do otherwise.

"The court is of the opinion that the policy did not preclude them from the alternative of demolition and reconstruction. The policy gives the insured time either to *rebuild,* repair or replace the damaged property. *It is considered that this affords, under proper circumstances, a choice.* In the light of the age of the Congress buildings, the building materials used in the old structure, and the severe damage caused by the fire, and ignoring any zoning and building code ordinances, it would not have been feasible, sensible or practical to have undertaken to repair and restore these antiquated structures." (Emphasis added.)

The appellants argue that the trial court erred in concluding that the insured, under the provisions of the insurance contract, had the "choice" under "proper circumstances" to be compensated for the period of time it would take to either (1) repair and restore the old premises, or (2) demolish the old buildings and construct a completely new facility.

The insurance contract does not give the insured such a "choice." The insured has only the right to recover for loss "resulting directly from *necessary* interruption of business caused by damage to or destruction of real or personal property . . . ." (Emphasis added.)

Whether demolition and reconstruction are proper depends entirely on whether such steps are necessary to

restore the building to its former condition. Other "circumstances" not bearing upon what is reasonably necessary to restore the premises to its previous condition are irrelevant and cannot be used to extend the period of compensation.

Three alternative illustrations help to point out the policies' meaning. If the damaged premises are repairable (*e.g.*, a cigarette hole burned in the carpet) the insured is entitled to compensation only for the period within which the necessary repairs can be effected. Where the damage is repairable the insured would have no right to compensation for the longer period of time it would take to completely demolish and reconstruct the premises.

If, on the other hand, the premises were totally destroyed or so badly damaged as to be unrepairable, the insured would be entitled to compensation for the period of time necessary to demolish what was left of the old structure and replace it.

As appellants point out, an insured may find it advantageous to utilize a business interruption caused by a fire to upgrade his business property; *e.g.*, he may decide to demolish a building with repairable damage and replace it with an entirely new structure. However, if he does, that decision should not increase the amount of recovery to which he is entitled—he would still be limited to compensation for the shorter period of time in which the structure could be repaired.

It appears that the premise which the trial court adopted would permit an insured, upon the occurrence of a fire which resulted in temporary cessation of business operation, to demolish a building for a variety of reasons wholly disassociated with the severity of the damage caused by the fire and to proceed with the construction of a completely new building—and to enjoy the assurance of continued income from business-interruption insurance during the period of construction.

The issues to be determined under a proper construction of the insurance contract are these:

(1) What is the nature of damage or destruction?

(2) What rebuilding, repairing or replacing will be reasonably *necessary* to restore the "damaged or destroyed" portions of the premises to their former condition? (*E.g.,* is it necessary to demolish the entire structure or portions thereof and engage in new construction in order to restore the premises?)

(3) How long, with "due diligence and dispatch" will such period of restoration take?

### *Period of Restoration.*

With regard to the period of restoration the trial court made the following findings:

"10. On January 13, 1966, a major fire occurred on the plaintiff's business premises which caused extensive damage and a complete cessation of the business operations of the plaintiff.

". . .

"17. The provisions of the insurance policies allowed the plaintiff time to *rebuild and restore the damaged premises* before commencing business, and permitted the plaintiff to act in a rational and businesslike manner in such rebuilding including the retention by plaintiff of an architect for planning purposes.

"18. The reasonable period of time necessary for the plaintiff to *rebuild and restore the damaged premises,* with due diligence and dispatch, is eleven (11) months or an equivalent number of weeks, disregarding entirely any additional time which may have been necessary due to the enforcement of any local or state ordinance or law regulating the construction, repair, or demolition of buildings or structures." (Emphasis added.)

The finding that eleven months is sufficient time in which to "rebuild and restore the damaged premises" is ambiguous. It could refer to demolition and reconstruction, or it could refer to demolition and reconstruction

plus repair. In light of the trial court's interpretation of the insurance contract, it seems likely that it refers to the demolition and reconstruction of the entire structure.

Assuming that the trial court found that eleven months was a reasonable period in which to demolish and reconstruct the entire structure, there is no corresponding finding that the damage to the premises was so severe that such steps were reasonably *necessary* to restore the buildings to their pre-fire condition. Even if such a finding had been made, it is questionable that it would be supported by the testimony in the record.

Assuming that the trial court determined that eleven months was a reasonable period in which to repair the restaurant and to demolish and reconstruct the bar, there is no corresponding finding that damage to the bar building was so severe that demolition and reconstruction of the entire building was reasonably necessary to restore the premises. Had such a finding been made it is doubtful that the record would support it.

In arriving at the eleven-month period of restoration, it appears that the trial court relied primarily upon the testimony of Gustavs Martinsons and Ralph Vogel.

Martinsons is a partner in the architectural firm of Peters & Martinsons of Madison. Martinsons was contacted by plaintiff-respondent in the early part of 1966 to prepare a feasibility study for a new building. As to damage to the Congress Bar and Restaurant, Martinsons testified as follows: The building showed heavy damage to both the bar and the restaurant. The bar was gutted by the fire and suffered structural damage in that a substantial portion of the barroom floor caved into the basement. The restaurant suffered primarily from water and smoke damage.

He testified that the condition of the building required the services of an architect or an engineer.

As to the period of time necessary for restoration, he testified as follows:

| | |
|---|---|
| Preliminary conference with owners and initial drawings .................... | 8 weeks |
| Final plans and specifications ....... | 6 weeks |
| Bidding, letting contracts and obtaining industrial commission approval ...... | 4–6 weeks |
| Demolition and construction ........ | 6 months |
| | 44–46 weeks |

As to the estimated period of construction the record reads as follows:

"*Q.* Now, on the basis of your observation as to the extent of the damage, and assuming repair in kind as we have been talking about—replacing the existing building, repairing or replacing where replacement is necessary, the existing building—how long would the construction job itself take? *A.* I would say a minimum of six months."

The testimony of Martinsons is ambiguous to the extent that it is not entirely clear whether the period of restoration is for demolition and reconstruction of the entire premises or whether it is for repair in part and demolition and reconstruction in part.

We have reviewed the record and are convinced that the evidence does not support a conclusion that the damage was so severe that such steps were reasonably necessary to effect restoration. According to Martinsons the only structural damage was the caved-in bar floor. He gave no testimony that the remainder of the premises was not repairable.

On cross-examination, he testified that there was no structural damage to the second floor of either the bar or restaurant, only smoke damage; there was no fire damage to the roof; and all the exterior walls were standing.

Ralph Vogel is president of Vogel Brothers Building Company. He testified that the damage to the restaurant area was primarily due to smoke, water, and heat. He

further testified that a third or a half of the floor in the bar area had fallen into the basement. He stated that the bar side was "pretty well completely gutted out." He also testified that structural damage existed on the bar side to the extent of the floor and that the floor section would have to be replaced.

He testified that plans and specifications would be necessary to restore the structure.

"Q. Now, Mr. Vogel, in light of the examination that you made and with your background and experience, do you have an opinion as to whether or not the bar section of the building was repairable, or would it have to be replaced?

"· · ·

"A. I believe I understand to this extent, that the portion of the—well, the common property, I guess it is, the portion that was used for bar purposes, that portion, I would say, *would have to be rebuilt.*" (Emphasis added.)

Mr. Vogel's estimate as to time for restoration is as follows:

| | |
|---|---|
| Drawings, plans and specifications .... | 8 weeks |
| Bidding and letting contracts .......... | 2–3 weeks |
| Approvals by industrial commission and building inspections department ....... | 6 weeks |
| Demolition and construction .......... | 7 months |
| Refixturing ....................... | 6 weeks |
| | 50–52 weeks |

After testifying that the estimated time for construction would take seven months, he stated that "if" the restaurant portion could be repaired rather than rebuilt, a month's time could be saved.

On recross-examination the record reads in part as follows:

"*Q.* All right. What part of the bar should be rebuilt? *A.* Insofar as the observations I made, it is true that the —I didn't make any actual check of the walls, the plaster, or wallboard or anything of the sort. This, under the circumstances, was not—not my job, actually, at the time, because I was primarily concerned with figuring a job. The structure, however, was in such a condition that I would very safely say that, without checking everything in the building, I wouldn't take a chance of just trying to rebuild a part of it.

"*Q.* And this is without making a survey? *A.* Right.

"*Q.* You mean to tell me, Mr. Vogel, that you would recommend to a client of yours that he tear down a building and build a substitute building without your knowing the structural integrity of the building that you're recommending that he tear down? *A.* No, I would not.

"*Q.* And you know nothing about the structural integrity of that bar building, do you? *A.* That's right.

"*Q.* And you're not talking, when you say it should be rebuilt, about the physical necessity of it being rebuilt, are you? This is a judgment on your part; isn't that true? *A.* That's right.

"*Q.* And it *isn't* a matter that it is *necessary* to rebuild. This is a matter what you'd recommend to the man that he do? Isn't that so? *A.* Yes." (Emphasis added.)

Thomas Flad, a well-recognized Madison architect, was also called as a witness by the plaintiff. He observed the premises only briefly as he either dropped off or picked up his son who was there after the fire, helping a son of one of the officers of the plaintiff. He too testified that only the first floor of the bar premises would have to be replaced. He acknowledged that he did not observe any burning or charring in the dining area; that he had no knowledge of the structural soundness of the floor in the dining area nor of the walls in either the restaurant or bar premises; that the repair work involving "a restoration in kind" of the first floor in the barroom was "no monumental task from an engineering standpoint."

We conclude that although the estimated period of restoration was computed on the basis of total demolition

and reconstruction, the record does not establish that, apart from the structural damage to the barroom floor, the damage to either the restaurant or the bar was so severe as to require demolition and reconstruction.

Due to the erroneous construction of the insurance contract, the incomplete and ambiguous findings, and the lack of essential testimony, the judgment must be reversed and the cause remanded for new trial.

### Prejudgment Interest.

The final issue is whether plaintiff was entitled to prejudgment interest.

Wisconsin has adopted the distinction between liquidated and unliquidated claims in determining whether prejudgment interest is payable in a contract liability dispute.[4]

In *Necedah Mfg. Corp. v. Juneau County*,[5] involving an action to recover damages by fire allegedly caused by defendant's negligence, this court concluded that one is:

". . . entitled to recover such interest on all such items of damage from the time that the probable pecuniary amount or money value thereof could have been computed or liquidated to a reasonable certainty by ascertaining the then current market or reasonable value, and the time that payment thereof first became due because of the terms of a contract, or, if none, then because of a demand for payment." [6]

Recently, in *California Wine Asso. v. Wisconsin Liquor Co.*,[7] wherein prejudgment interest was denied on a claim for breach of an exclusive liquor distributorship contract, we held that:

---

[4] *Necedah Mfg. Corp. v. Juneau County* (1932), 206 Wis. 316, 237 N. W. 277, 240 N. W. 405; followed in *Kleinschmidt v. Aluminum & Bronze Foundry* (1956), 274 Wis. 231, 79 N. W. 2d 802.

[5] *Supra*, footnote 4.

[6] *Id.* at page 335.

[7] (1963), 20 Wis. 2d 110, 132, 121 N. W. 2d 308.

". . . before interest can be recovered the amount claimed must be fixed or determined or readily determinable. *Maslow Cooperage Corp. v. Weeks Pickle Co.* (1955), 270 Wis. 179, 192, 70 N. W. (2d) 577. See *Necedah Mfg. Corp. v. Juneau County* (1932), 206 Wis. 316, 334, 237 N. W. 277."

Respondent's claim was for an amount substantially in excess of the amount finally determined to be due. To award respondent interest when it was able to establish just over half of its claim would encourage the overstatement of claims.

Respondent contends its position is supported by *Olson v. Herman Farmers Mut. Ins. Co.*[8] In that case the proof of loss was returned to the insured and liability under the policy was denied by the insurance company on the ground that failure to disclose an additional mortgage on the property rendered the policy void under a policy provision requiring full disclosure of all material facts and circumstances. But the amount claimed was liquidated and undisputed. We therefore conclude *Olson* is distinguishable.

Although there are jurisdictions where the recovery of interest upon unliquidated claims is permitted,[9] we see no reason why the Wisconsin doctrine to the contrary should be altered. As long as there is a genuine dispute about the amount that is due, the insurer should not have to pay interest until the amount has been determined and judgment entered thereon.

*By the Court.*—Judgment reversed; cause remanded for further proceedings not inconsistent with this opinion.

[8] (1925), 187 Wis. 15, 203 N. W. 743.
[9] 47 C. J. S., *Interest*, pp. 29, 30, sec. 19.