**AFRAM EXPORT CORPORATION, a Wisconsin corporation, Plaintiff-Appellee,**

v.

**METALLURGIKI HALYPS, S.A., a foreign corporation, Defendant-Appellant.**

Nos. 84–2524, 84–2601.

United States Court of Appeals, Seventh Circuit.

Argued April 19, 1985.

Decided Sept. 5, 1985.

Milton Shinken, Shinken & Shinken, Milwaukee, Wis., for plaintiff-appellee.

John H. Gross, Anderson, Russell, Kill & Olick, P.C., New York City, for defendant-appellant.

Before ESCHBACH and POSNER, Circuit Judges, and SWYGERT, Senior Circuit Judge.

POSNER, Circuit Judge.

The appeal and cross-appeal in this diversity breach of contract suit raise a variety of interesting issues, in particular of personal jurisdiction and contract damages.

Afram Export Corporation, the plaintiff, is a Wisconsin corporation that exports scrap metal. Metallurgiki Halyps, S.A., the defendant, is a Greek corporation that makes steel. In 1979, after a series of trans-Atlantic telephone and telex communications, the parties made a contract through an exchange of telex messages for the purchase by Metallurgiki of 15,000 tons of clean shredded scrap, at $135 per ton, F.O.B. Milwaukee, delivery to be made by the end of April. Metallurgiki apparently intended to use the scrap to make steel for shipment to Egypt, pursuant to a contract with an Egyptian buyer. Afram agreed to pay the expenses of an agent of Metallurgiki—Shields—to inspect the scrap for cleanliness before it was shipped.

The scrap for the contract was prepared, in Milwaukee, by Afram Metal Processing Company. Both Afram Metal Processing and the plaintiff Afram Export are wholly owned subsidiaries of Afram Brothers. All three are Wisconsin corporations, and have the same officers and directors. Unless otherwise indicated, when we say "Afram" we mean "Afram Export."

Shields arrived to inspect the scrap on April 12. He told Afram that the scrap was clean but that Metallurgiki would not accept it, because the price of scrap had fallen. Sure enough, Metallurgiki refused to accept it. Afram brought this suit after selling the scrap to other buyers. Metallurgiki unsuccessfully challenged the court's jurisdiction over it, then filed a counterclaim alleging that Afram had broken the contract and had thereby made it impossible for Metallurgiki to fulfill its contract with the Egyptian purchaser.

After a bench trial, the district judge gave judgment for Afram for $425,149 and dismissed the counterclaim. 592 F.Supp. 446 (D.Wis.1984). Metallurgiki has appealed from the judgment for Afram, and

Afram has cross-appealed, contending that the judge should have given it the full damages it sought based on the difference between the contract price and the cover price—$483,750—plus incidental damages of $40,665, prejudgment interest, the costs of a so-called public sale, and attorney's fees for defending against the counterclaim.

■ The first question we take up is whether Wisconsin's long-arm statute (Wis. Stat. §§ 801.05(5)(c), (d)) can be used, consistently with the due process clause of the Fourteenth Amendment, to haul Metallurgiki before a federal court in Wisconsin. That clause of course places no direct limitation on the powers of a federal court; it constrains only state action. But a federal district court's extraterritorial reach, so far as is relevant to this case, depends on the long-arm statute of the state where the court sits. See Fed.R.Civ.P. 4(e), (f); Advisory Committee's Note on 1963 Amendment. Hence the limitations that the Fourteenth Amendment places on the state's application of its long-arm statute are equally limitations on the district court's power. See, e.g., *Southwire Co. v. Trans-World Metals & Co.*, 735 F.2d 440, 442, 445 (11th Cir.1984); *Brown v. Flowers Industries, Inc.*, 688 F.2d 328, 331–32 (5th Cir. 1982). This may seem rather mechanical reasoning but its result can be defended in diversity cases by reference to the undesirability of creating new incentives to invoke the diversity jurisdiction.

Metallurgiki does not argue that international law or the due process clause of the Fifth Amendment places limitations on the district court's power to assert jurisdiction over Metallurgiki beyond those in the due process clause of the Fourteenth Amendment, while Afram does not argue that Metallurgiki, as an alien, has fewer rights to challenge the long-arm statute than a nonresident American firm would have. Countless cases assume that foreign companies have all the rights of U.S. citizens to object to extraterritorial assertions of personal jurisdiction. See, e.g., *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404

(1984); *Securities Investor Protection Corp. v. Vigman*, 764 F.2d 1309, 1316 (9th Cir.1985); *Southwire Co. v. Trans-World Metals & Co., supra; Dotterweich v. Yamaha Int'l Corp.*, 416 F.Supp. 542, 544 (D.Minn.1976). The assumption has never to our knowledge actually been examined, but it probably is too solidly entrenched to be questioned at this late date, and in any event it has not been made an issue in this case.

In arguing against extraterritorial jurisdiction, Metallurgiki points out that it has no office, employees, or assets in Wisconsin and that all the dealings between the parties (apart from Shields' visit of inspection) were conducted by international telephone and telex communications and by face-to-face discussions in New York. Shields, the only representative of Metallurgiki who set foot in Wisconsin, although an agent and former employee of Metallurgiki, was in April 1979 an independent contractor, and he spent only five hours in Wisconsin on the inspection trip and only 20 or 40 minutes (the record is unclear which) in the actual inspection. It is also unclear who initiated the negotiations that led up to the making of the contract.

■ A state cannot force a nonresident to litigate in its courts unless there is "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958). In other words, the defendant must derive some benefit from the state to balance the cost of exposure to suit in what is likely to be an inconvenient, perhaps even an unfriendly, forum.

■ By this criterion, a contract between a resident of a state and a nonresident is not enough by itself to give the courts of the resident's state jurisdiction over the nonresident in the resident's suit for breach of the contract. See *Burger King Corp. v. Rudzewicz*, —— U.S. ——, 105 S.Ct. 2174, 2185, 85 L.Ed.2d 528 (1985); *Bond Leather Co. v. Q.T. Shoe Mfg. Co.*, 764 F.2d 928, 934–35 and n. 4 (1st Cir.1985). Imagine

that a bank in Atlanta, in response to an advertisement in an Atlanta newspaper, ordered office equipment by mail from a company in California, and the seller arranged for the delivery of the equipment at the bank's office in Atlanta. The bank would be justifiably surprised to find that by doing this it had exposed itself to suit in California should a dispute arise over the sale. What benefit had California conferred on it? No doubt California provided some of the services that enabled the seller to produce and sell the office equipment, but the benefit thereby conferred on the distant buyer is too attenuated to require him to bear the expense of involuntarily litigating in so remote a forum. This would be even clearer if the buyer were an individual rather than a firm and the seller were trying to sue the buyer in a small-claims court in the seller's state, though these factors are not essential to the conclusion that the seller's effort to obtain extraterritorial jurisdiction over the buyer would fail. See, e.g., *Kleinfeld v. Link*, 9 Ohio App.3d 29, 457 N.E.2d 1187 (1983); *Tube Turns Division of Chemetron Corp. v. Patterson Co.*, 562 S.W.2d 99 (Ky.App. 1978); Scoles & Hay, Conflict of Laws 304–05 (1982); Currie, *The Growth of the Long Arm: Eight Years of Extended Jurisdiction in Illinois*, 1963 U.Ill.L.Forum 533, 576–77; cf. *Spiegel, Inc. v. FTC*, 540 F.2d 287, 292 (7th Cir.1976).

Since the dispute must be litigated somewhere, there is perhaps implicit in the foregoing analysis the idea that the seller can sue more easily in the buyer's jurisdiction than the buyer can defend in the seller's. The seller in our example presumably sells office equipment all over the country and can without much difficulty arrange for local counsel wherever disputes with its buyers arise, while the buyer buys office equipment rarely and may be somewhat at a loss to arrange for an effective defense on the seller's home ground. This is one of several factors that distinguish our case from the hypothetical example. Putting aside the adventitious circumstance that Metallurgiki has an office in New York City and at oral argument (but not before

then) expressed willingness to entertain the possibility of being suable in New York, the argument against extraterritorial jurisdiction here amounts to saying that if a foreign company negotiates by phone a large purchase of industrial raw materials from an American company for delivery in America, the American company still must go abroad in order to sue for breach of the contract. Since the buyer's role is not passive as in our mail-order hypothetical, since the buyer is not a one-time or infrequent purchaser of the product in question but a recurrent purchaser of what is a basic raw material used in his business, since performance is technically complete in the United States, and since the alternative forum may represent a substantial hardship to the seller, it is hard to see why it is more reasonable to make the seller go to the buyer's forum to sue (Georgia in our hypothetical example) than to make the buyer defend in the seller's forum. Most though not all courts probably would uphold extraterritorial jurisdiction in such a case. See, e.g., *Nicholstone Book Bindery, Inc. v. Chelsea House Publishers*, 621 S.W.2d 560 (Tenn.1981); *Parker Bros. Farms, Inc. v. Burgess*, 197 Mont. 293, 298–99, 642 P.2d 1063, 1066 (1982); *Yankee Metal Products Co. v. District Court of Oklahoma County*, 528 P.2d 311 (Okla.1974); *Prentice Lumber Co. v. Spahn*, 156 Mont. 68, 74–76, 474 P.2d 141, 144–45 (1970); *State ex rel. White Lumber Sales, Inc. v. Sulmonetti*, 252 Ore. 121, 448 P.2d 571 (1968); *Peter Pan Seafoods, Inc. v. Mogelberg Foods, Inc.*, 14 Wash.App. 527, 544 P.2d 30 (1975); but see, e.g., *Rath Packing Co. v. Intercontinental Meat Traders, Inc.*, 181 N.W.2d 184 (Ia.1970); *NRM Corp. v. Pacific Plaster Pipe Co.*, 36 Ohio App.2d 179, 304 N.E.2d 248 (1973).

■ We do not want to put too much weight on any single one of the distinguishing factors that we have mentioned. If the bank in our hypothetical example had sent its office manager to California to inspect the office equipment before it was shipped, we doubt whether this would be enough to subject the bank to the jurisdiction of the

California courts in the event that the seller sued over the contract of sale. Neither would delivery in the seller's state be enough by itself. *Lakeside Bridge & Steel Co. v. Mountain State Construction Co.*, 597 F.2d 596 (7th Cir.1979), a leading precedent for the rule that a single contract is not enough to confer personal jurisdiction over a nonresident buyer, see Note, *Long-Arm Jurisdiction in Commercial Contracts: When Is a Contract a Contact?*, 61 Boston U.L.Rev. 375, 386–87 (1981), refused to apply Wisconsin's long-arm statute in a case superficially much like this one: a Wisconsin seller had agreed to deliver the goods called for by the contract in Milwaukee, at the seller's rail siding, for shipment to the buyer, a company in West Virginia, and the contract had been negotiated in person outside of Wisconsin and over the telephone. There are many similar cases. See, e.g., *Danville Plywood Corp. v. Plain & Fancy Kitchens, Inc.*, 218 Va. 533, 238 S.E.2d 800 (1977) (per curiam); *Scullin Steel Co. v. National Railway Utilization Corp.*, 676 F.2d 309, 313 (8th Cir.1982); *Galgay v. Bulletin Co.*, 504 F.2d 1062, 1066 (2d Cir.1974).

■ Our subsequent cases, however, treat *Lakeside* as standing at the outer limits of the principle that sale and delivery to the nonresident in the resident's state do not establish sufficient contacts with that state to give it jurisdiction over the nonresident in the resident's suit for breach of contract. These cases uphold jurisdiction if there are other contacts with the seller's state besides delivery. See, e.g., *Madison Consulting Group v. South Carolina*, 752 F.2d 1193, 1200–05 (7th Cir.1985); *Snyder v. Smith*, 736 F.2d 409 (7th Cir.1984); *Wisconsin Electrical Mfg. Co. v. Pennant Products, Inc.*, 619 F.2d 676 (7th Cir.1980). Here there is Shields' visit to Wisconsin to inspect the scrap—and thus inspection as well as delivery in the seller's state. The visit was brief, but Shields was the buyer's agent sent to the seller's state to carry out a vital function in the administration of the contract. We are not just mechanically counting contacts; Wisconsin not only provided police and fire protection and perhaps other services for the facilities at which the buyer took possession (as in *Lakeside*), but also provided protection for the visit of the buyer's agent to inspect the goods before shipment.

Another point distinguishes this case from *Lakeside*. The alternative forum for this litigation (for as we have said the suggestion that Afram might have sued Metallurgiki in New York comes too late) would have been Greece; and the fact that Metallurgiki has an office in the United States, but Afram (so far as appears) no office outside the United States, would seem to make the alternative forum more burdensome for Afram than Wisconsin was for Metallurgiki. Cf. *McGee v. International Life Ins. Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957). Metallurgiki could not have been surprised to discover that if it ordered goods in America and went into America (through agents or directly) to inspect the goods and take delivery of them, it might be forced in the event of a contract dispute to litigate in America rather than being able to retreat to Greece. *Hall's Specialties, Inc. v. Schupbach*, 758 F.2d 214 (7th Cir.1985), on which Metallurgiki relies, is distinguishable. The buyer, an Indianan, sued the seller, an Illinoian, in Indiana. The seller's sole contact with Indiana was that he had advertised the product in an Indiana farm journal. And he had done so involuntarily, the court found; the advertisement had been placed in an Illinois farm journal and had "found its way" into the Indiana journal without the seller's knowledge. *Id.* at 216.

Metallurgiki argues that its contract with Afram did not require delivery in Wisconsin, that the words "F.O.B. Milwaukee" meant only that Metallurgiki had to pay the cost of getting the scrap from Milwaukee to its factory in Greece, and that Afram would not have broken the contract if it had shredded the scrap in Alaska and delivered it to a common carrier in Juneau for shipment to Greece, though it would have had to pay the difference between the cost of transporting the scrap to Greece

from Milwaukee and the cost of transporting it from Juneau. This argument is unsound, not only because "F.O.B. Milwaukee" means that the seller was contractually required to make delivery in Milwaukee, not elsewhere, see White and Summers, Handbook of the Law Under the Uniform Commercial Code 107 (2d ed. 1980), but also because the Afram companies are a Wisconsin enterprise, their scrap heap and shredding facilities and loading dock are all in Milwaukee, and the probability that they would deliver the shredded scrap in another state was therefore slight. It thus was no accident that the scrap was shredded and delivered to Metallurgiki in Wisconsin, cf. *Wisconsin Electrical Mfg. Co. v. Pennant Products, Inc., supra,* 619 F.2d at 678, and wherever it was delivered that was where Shields would go to inspect it.

The next question raised by Metallurgiki's appeal is whether the district judge improperly interfered with Metallurgiki's ability to litigate in Wisconsin. Metallurgiki wanted to depose its president, George Anastassopoulos, in Greece. Ordinarily a party does not depose his own witnesses; he deposes his opponent's witnesses, in order to get information to use in developing his own case or in cross-examining the opponent's witnesses at trial. Metallurgiki wanted to depose Anastassopoulos merely to save him the inconvenience of coming to Milwaukee for the trial; it wanted a deposition it could use in lieu of live testimony, pursuant to Rule 32(a)(3) of the Federal Rules of Civil Procedure. (We need not decide whether such a deposition would have been admissible under Rule 32(a)(3)(B), or (E), or neither.) Apparently his testimony was important to Metallurgiki's counterclaim, although the record does not indicate just what he was expected to testify to.

■ The civil rules do not specify the place for deposing a party, so Metallurgiki was within its rights in noticing the deposition for Greece. But Afram equally was within its rights in moving the district judge under Rule 26(c)(2) to alter the place of the deposition to the United States.

Rule 26(c) offers little guidance for the exercise of the powers that it grants the district judge. He may, "for good cause shown, ... make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense...." With a standard so general, applied to questions of trial management, the district court's discretion is broad and the effective scope of appellate review quite limited. See *Marrese v. American Academy of Orthopaedic Surgeons,* 726 F.2d 1150, 1159 (7th Cir.1984) (en banc), rev'd on other grounds, — U.S. ——, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985).

■ Saving the time and expense of bringing Mr. Anastassopoulos from Greece was not an unworthy object. But in the absence of any special showing of hardship (not made), it was not so compelling a one as to require the judge to ignore the time and expense to Afram's lawyers of having to go to Greece—for they would have had to be present at a deposition intended for use at trial in order to be able to object to specific questions. The absence of a federal judge or magistrate in Greece, which would make it difficult—though in an age of excellent international telephony not impossible—to rule on objections, was a factor tilting the balance of convenience against Metallurgiki's motion. But the decisive factor was that the judge permitted the deposition to be held either in Milwaukee or New York. As Metallurgiki has an office in New York and Anastassopoulos's business travels take him there frequently, he could have been deposed there without inconvenience to himself. And although the order granting Afram's Rule 26(c) motion and ordering that the deposition be conducted in New York or Milwaukee but not Greece was not made till September 20, 1982, three weeks before the trial began, that was enough time for Metallurgiki to depose Anastassopoulos in New York. Moreover, the suit was by that time two and a half years old, so Metallurgiki had already had plenty of time to notice the deposition for New York and thereby obvi-

ate the controversy over conducting it in Greece. In light of Anastassopoulos's frequent travels to New York, the noticing of the deposition in Greece may have been little more than a gambit to cause inconvenience to Afram.

The deposition was never conducted. Metallurgiki first decided to bring Anastassopoulos to Milwaukee to testify live at the trial after all, then changed its mind and on October 8, five days before the trial began, asked the district judge to hold open the record of the trial until December 1 so that a videotaped deposition of Anastassopoulos could be conducted in New York. On the second day of the trial (October 14) the judge denied the motion but ruled that Anastassopoulos would have until October 21 to appear in person and testify at the trial, which would resume for this purpose if it had ended before then. On October 19, the last day of the trial, Metallurgiki asked for ten more days before Anastassopoulos had to testify. The judge refused, which Metallurgiki argues was another error—an error highlighted by the fact that after insisting that the trial not be delayed any further the judge took 21 months to render judgment. This shows, Metallurgiki argues, that the proceeding was not conducted with a sense of urgency such as might have justified a refusal to give Anastassopoulos ten more days.

 Again and for the same reasons as before, the standard of appellate review is deferential. See, e.g., *Communications Maintenance, Inc. v. Motorola, Inc.*, 761 F.2d 1202, 1207 (7th Cir.1985). A refusal to grant a continuance on grounds of illness is occasionally reversed, see, e.g., *Gaspar v. Kassm*, 493 F.2d 964, 969 (3d Cir. 1974); cf. *Morrissey v. National Maritime Union*, 544 F.2d 19, 31–32 (2d Cir.1976) (Friendly, J.), but there was no abuse of discretion here, although the question is harder than that of the refusal to allow Anastassopoulos to be deposed in Greece.

A telecopied message from Anastassopoulos's lawyer in Greece, dated October 6, stated that Anastassopoulos "is to appear in front of the appeals court of Salonica on Friday, the 8th of October 1982, as a witness in a case the duration of which may be two or three days." The telex added that "on the 17th of October, general elections are held for the election of mayors and other county authorities," that "according to Greek statutory law voting is obligatory for all Greek citizens," and that violation of the law is punishable by (among other sanctions) imprisonment for up to a year. The elections held on October 17 were inconclusive and run-off elections were held on October 24. Since Anastassopoulos had to be in the United States on other business on the 28th and 29th, he wanted to postpone his testimony to one of those days.

These excuses are full of holes. If the case in Salonica took three days (excluding weekend days), still it would end on the 12th, leaving four full days before Anastassopoulos had to be back in Greece to vote. Of course trials are often delayed, Greek trials we suppose as well as American; but there is nothing in the telecopied message about the importance of Anastassopoulos's appearance in the Salonica trial, the nature of the case, the consequences of his not appearing, or the possibility that the trial might be postponed to allow him to testify in Milwaukee. Moreover, it is not to be believed that on October 17, 1982, every Greek citizen living outside of the country trooped back to Greece to vote, on penalty of being imprisoned if he did not. Common sense tells us that there must be either absentee ballots or excuses for persons who have urgent foreign business, as Anastassopoulos had, assuming he could not squeeze a trip to Milwaukee between the trial in Salonica and election day. In any event, after voting on October 17, Anastassopoulos still had a week in which to appear and testify in Milwaukee before he had to go back to Greece to vote in the run-off election (assuming he really had to); and he is an international businessman, accustomed to trans-Atlantic commuting.

Although Metallurgiki's excuses were threadbare, the leisurely manner in which the judge decided the case after the trial ended does make one wonder whether giv-

ing Metallurgiki another ten days to produce Anastassopoulos would have caused the district court serious problems. It is not as if the entire trial would have had to be postponed or a jury dismissed and then recalled; it was just a matter of the judge's freeing up a morning or afternoon to hear a few hours of additional testimony. Nevertheless the importance of maintaining the integrity of trial judges' schedules in a period of heavy caseloads is substantial, and we cannot say that it was so clearly outweighed by the defendant's needs that the judge abused his discretion in refusing to grant a continuance on suspiciously thin grounds—especially when we reflect that the entire problem was of Metallurgiki's own making. Had Metallurgiki deposed Mr. Anastassopoulos in New York before the trial, as it could have done without inconvenience whenever he happened to be in New York (provided, of course, that due notice of the time and place of the deposition was given Afram's lawyers), it would not have had to worry about bringing him to Milwaukee for the trial.

This completes our consideration of Metallurgiki's appeal and we turn to Afram's cross-appeal. Afram claims that it sold all of the scrap rejected by Metallurgiki at a public sale on June 15, 1979, and that its damages should therefore be based on the price of that sale, which was $102.75 per ton. The district judge disagreed. He found that two-thirds of the scrap had been sold at a substantially higher price to Luria Brothers on June 4 ($118—actually somewhat less, because Afram defrayed some freight costs) and the other third to International Traders on September 15 at a price of $103. Afram points out that the sale on June 4 actually was made by its affiliate, Afram Metal Processing Company, and further argues that since all Afram scrap is sold from the same pile in Milwaukee it is arbitrary to treat the first sale after the breach of contract as the cover transaction, rather than the sale that Afram designated as that transaction.

We agree with the district judge that the sale on June 4 was a cover transac-

tion, even though the nominal seller was a different corporation from the plaintiff. Not only are both corporations wholly owned subsidiaries of another corporation, not only do all three corporations have the same officers and directors, but the record indicates substantial commingling of assets and operation of the three corporations as a single entity. Shortly after Metallurgiki's rejection, Zeke Afram, an officer of both Afram Export (the party to the contract with Metallurgiki) and Afram Metal Processing (the nominal owner of the scrap sold on June 4), called Luria Brothers and explained that he had extra scrap for sale because of a buyer's breach; apparently he did not bother to indicate which Afram corporation he was calling on behalf of. The June 4 sale followed shortly. The conversation and the timing of the sale are powerful evidence that the breach enabled the sale—that it would not have occurred but for the breach—and hence that the revenue from the sale must be subtracted from the contract price to determine Afram's loss. Cf. *Servbest Foods, Inc. v. Emessee Industries, Inc.*, 82 Ill.App.3d 662, 668–72, 37 Ill.Dec. 945, 951–53 403 N.E.2d 1, 7–9 (1980).

But this does not dispose completely of the issue of the cover price. If the sale on June 15 was "made in good faith and in a commercially reasonable manner," it fixed Afram's damages on the remaining one-third of the scrap. UCC § 2–706(1), Wis.Stat. § 402.706(1). The question may seem less than earthshaking since the June 15 sale price and the September sale price which the district court used as the cover price for the remaining third were only 25¢ per ton apart. But the bona fides of the June 15 sale casts additional light on the intercorporate relations of the Afram group and hence on the proper interpretation of the sale to Luria Brothers. In any event, the district judge was entitled to find that neither condition in section 2–706(1) was satisfied. Cf. *Coast Trading Co. v. Cudahy Co.*, 592 F.2d 1074, 1080–81 (9th Cir.1979). The June 15 "sale" was about as pure a bookkeeping transaction—

as empty of economic significance—as can be imagined. Cf. *Milbrew v. Commissioner of Internal Revenue*, 710 F.2d 1302, 1305 (7th Cir.1983). It consisted of a transfer of the scrap on the books of one affiliated corporation to the books of another. The transferor and transferee were not only under common ownership but were operated as if they were limbs of a single organism. The scrap itself was not moved; it remained on the scrap heap till sold later on. No invoice or check for the sale was produced at trial. The inference that the sale was designed simply to maximize the enterprise's damages, leaving it free to resell the scrap at higher prices later on, is overpowering. The sale of the scrap three months later to International Traders at a (slightly) higher price provided better evidence of what the enterprise actually lost, so far as the scrap not sold to Luria Brothers is concerned, by Metallurgiki's breach of contract.

■ The next issue relates to incidental damages, which the Uniform Commercial Code allows a seller who is the victim of a breach of contract to recover in addition to the difference between sale price and cover price. UCC § 2–706(1), Wis.Stat. § 402.-706(1). Incidental damages are "any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach." UCC § 2–710, Wis.Stat. § 402.710. Afram says it borrowed $2.5 million from a bank of which $2.025 million was to finance the purchase of the junked cars that it shredded in order to produce scrap in the form called for by the contract with Metallurgiki. It has calculated the interest (some $40,000) that it paid between the date of breach and the date of cover on the amount of the loan used to finance the cars. But it can recover this interest, if at all, only as incidental damages, and not as consequential damages, for under the Uniform Commercial Code consequential damages are a buyer's, not a seller's, remedy. See UCC § 2–715, Wis.Stat. § 402.715; *Nobs Chem-*

*ical, U.S.A., Inc. v. Koppers Co.*, 616 F.2d 212, 216 (5th Cir.1980).

The line between incidental and consequential damages is rather unclear. It may help in locating it to notice that in many cases of consequential damages, a buyer who is the victim of a seller's breach of contract is seeking damages for consequences that he could have avoided or minimized at lower cost than the contract breaker. *EVRA Corp. v. Swiss Bank Corp.*, 673 F.2d 951, 957 (7th Cir.1982). In the case that established the common law's position that consequential damages are not recoverable without special notice to the seller, *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng.Rep. 145 (1854), the defendant, a carrier, broke a contract with the plaintiff to deliver the plaintiff's mill shaft to the manufacturer of the shaft for repair. Because the plaintiff had no spare shaft, it was forced to shut down the mill; and it sought the profits that it lost during the period of shut-down caused by the defendant's delay in delivering the shaft. The court refused to award these damages. They could easily have been avoided by the plaintiff's having a spare shaft, which prudence dictated that a mill owner have anyway. This omission could not fairly be charged to the seller. It was not—as the prerequisite for obtaining consequential damages in a contract case has come to be called, see, e.g., Farnsworth, Contracts § 12.14, at p. 876 (1982)—"foreseeable" by him, because a seller is not charged with foreseeing the buyer's imprudence.

■ This would be the same case, only in the unusual setting of a seller's seeking consequential damages, if Metallurgiki's breach of contract had precipitated Afram into bankruptcy because Afram was paying back-breaking interest on the loan that it had taken out to enable it to fulfill its obligations under the contract. Afram would be responsible for arranging its affairs in such a way as not to be abnormally vulnerable to a breach of contract; excessive leverage would be the counterpart to Hadley's failure to keep a

spare shaft on hand. At the other end of the spectrum, reasonable expenses incurred by Afram in putting the scrap in a form where it would be salable to a substitute buyer would be recoverable as incidental damages; virtually by definition, such expenses could not be avoided by greater prudence on the seller's part.

■ The actual case is somewhere in the middle, but if we had to decide exactly where, we probably would disagree with the district judge, who regarded this as a case of consequential rather than incidental damages. Although knowledge of the details of the seller's financial arrangements is not chargeable to the buyer, it is obvious to the buyer and unavoidable by the seller that the seller will incur an interest cost (explicit or implicit, as we shall see) in the interval between the breach of the contract and the cover sale; and the party who is better able to avoid this expense and who therefore should bear the risk of its occurrence is the contract-breaking buyer, not the seller. The cases therefore allow the seller to recover the additional interest expense as incidental damages. See, e.g., *Bulk Oil (U.S.A.), Inc. v. Sun Oil Trading Co.,* 697 F.2d 481, 482–84 (2d Cir.1983); *Hofmann v. Stoller,* 320 N.W.2d 786, 792–93 (N.D.1982); *Gray v. West,* 608 S.W.2d 771, 781 (Tex.Civ.App.1980).

The district judge also suggested that there was no damage, incidental or consequential: "presumably the interest costs for the money to purchase the junk cars would be recovered when the scrap which they had become was sold to some purchaser," so that Afram would be made "whole as to this cost of raw materials through the award of the difference between the contract price and the resale price." But this implies that the price charged to the substitute buyers, Luria Brothers and International Traders, would be calculated on a cost-plus basis, and thus include the additional interest expense that Afram incurred because of Metallurgiki's breach of contract. Prices in competitive markets are not determined on that basis, however; and so far as the record shows the market for steel scrap is competitive. The prices that Luria Brothers and International Traders were willing to pay for Afram's steel scrap depended on how much these buyers would have had to pay for the product from competing sellers, not on how much extra interest Afram had to pay because of the delay in selling its scrap.

■ Nevertheless we agree with the district court's conclusion that Metallurgiki is not liable for the interest that Afram seeks. All the record contains is the computation of interest. There is no evidence that Afram would have repaid the loan, or $2.025 million of it, on payment of the contract price by Metallurgiki, had that happy event occurred. The loan agreement was not placed in evidence, and since the loan is for more than the amount used to buy the junked cars, there is no presumption that it would have been paid back as soon as the contract for which the junked cars had been bought was fulfilled. Indeed, we do not even know whether the loan was repaid when Afram resold the scrap to Luria Brothers and International Traders. For purposes of computing prejudgment interest, a separate item of damages discussed next, Afram kept on calculating interest, at the same rate (prime plus .5 percent) as the interest rate on the loan, right up to the date of trial; this is consistent with Afram's not having repaid the loan when it resold the scrap.

■ So far as the proof shows, then, Afram is not really complaining about an extra interest expense; it is complaining about losing the use of part of the money it borrowed from the bank, the part that was tied up in the junked cars longer than it would have been had Metallurgiki not broken the contract. This of course is a genuine loss; it is what economists call an "opportunity cost," and courts now understand that an opportunity cost is a real cost. See, e.g., *Simmons v. United States,* 698 F.2d 888, 898 (7th Cir.1983). In this case it would be measured by the interest or profit that Afram could have obtained from investing, or using elsewhere in its business, the money that it would have gotten from

Metallurgiki by the end of April if Metallurgiki had not broken the contract, but that as a result of the breach it did not get till June and September.

But a forgone profit from exploiting a valuable opportunity that the breach of contract denied to the victim of the breach fits more comfortably under the heading of consequential damages than of incidental damages. The profits that Afram might have made from using that $2.025 million elsewhere in its business are like the milling profits that Hadley might have made if the carrier had not delayed in delivering the mill shaft for repair. Afram has not tried to establish its lost profits from the temporary loss of the use of the $2.025 million; all it is seeking is the extra interest it had to pay. But its theory is one of opportunity cost, as it makes clear in its brief by stating that it would be entitled to interest as incidental damages even if it had not used borrowed money to pay for the junked cars. Afram is correct that it would incur an opportunity cost whether it used its own money or used money that it had borrowed; in either event it would lose the use of money that it could deploy elsewhere at a profit. But we do not think the law has evolved to the point where every time a buyer breaks a contract, the seller is entitled to the time value of the money tied up in the contract, as incidental damages. All the seller is entitled to is an out-of-pocket interest expense that would not have been incurred but for the breach. We have found no case where (so far as we are able to determine from the statement of facts in the case) the seller was able to recover interest on a general business loan not tied to the subject matter of the sale, but we have found two cases that imply he may not. See *Schiavi Mobile Homes, Inc. v. Gironda*, 463 A.2d 722, 727 (Me.1983); *S. C. Gray, Inc. v. Ford Motor Co.*, 92 Mich. App. 789, 811–12, 286 N.W.2d 34, 43–44 (1979).

We point out that Afram chose to bring this suit in federal court (under the diversity jurisdiction) rather than in a Wisconsin state court, as it could have done. A party who wants a court to adopt an innovative rule of state law should litigate in state rather than federal court (if it can; it cannot if the defendant removes the case to federal court). Federal judges are disinclined to make bold departures in areas of law that we have no responsibility for developing. A resident of Wisconsin, Afram could not be concerned with encountering prejudice in the Wisconsin state courts against a nonresident; that was something for Metallurgiki to worry about. There is a serious question whether as an original matter a resident ought ever be allowed to invoke the diversity jurisdiction, whose only modern *raison d'etre* is to protect nonresidents against bias in favor of residents. But certainly when a resident does invoke the diversity jurisdiction, and perhaps in any case, he cannot expect to receive a very sympathetic hearing for his argument that the federal court should adopt an innovative interpretation of state law.

Afram also seeks and was denied prejudgment interest. This is interest not on the whole contract price but on Afram's damages, a much smaller amount; and it runs not from the date of breach to the date of cover but from the date of breach to the date of judgment and is allowed at the rate of interest fixed by statute rather than (as Afram supposes) at a market rate of interest. Although we give substantial weight to the interpretation of state law by a district judge who sits in that state, see *In re Air Crash Disaster Near Chicago*, 701 F.2d 1189, 1195 (7th Cir.1983); but cf. *In re McLinn*, 739 F.2d 1395, 1403 (9th Cir.1984) (en banc), we cannot give it controlling weight; the parties are entitled to judicial review, and we think it fairly plain that Wisconsin law allows prejudgment interest in a case such as this.

Looking first to general principles, we point out that while at one time a plaintiff in a contract suit could obtain an award of prejudgment interest only if the suit was for a fixed amount, as in a suit to collect a promissory note, this is no longer required; it is nowadays quite enough that the

amount of damages be ascertainable by reference to an objective standard of value, such as market value where "readily ascertainable." *Potter v. Hartzell Propeller, Inc.*, 291 Minn. 513, 518–19, 189 N.W.2d 499, 504 (1971) (per curiam). See, e.g., *Rauser v. LTV Electrosystems, Inc.*, 437 F.2d 800, 805–06 (7th Cir.1971); 5 Corbin on Contracts § 1048, at p. 296 (1964); 11 Williston on Contracts § 1413, at pp. 622–25 (1968); Dobbs, Handbook on the Law of Remedies 165–66 (1973). In other fields of law, too, courts increasingly award prejudgment interest, noting for example that a failure to award such interest gives defendants an incentive to prolong litigation. See, e.g., *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655–56 n. 10, 103 S.Ct. 2058, 2062–63 n. 10, 76 L.Ed.2d 211 (1983).

The Wisconsin cases seem generally in accord with the position outlined above, though we can find no case on point. Provided that there is "a reasonably certain standard of measurement by the correct application of which [the party who breaks the contract] can ascertain the amount he owes," prejudgment interest will be awarded, *Dahl v. Housing Authority*, 54 Wis.2d 22, 31, 194 N.W.2d 618, 623 (1972), unless the damage claim is "substantially inflated," *Wyandotte Chemicals Corp. v. Royal Electric Mfg. Co.*, 66 Wis.2d 577, 586, 225 N.W.2d 648, 653 (1975). Afram passes this two-part test (the second part of which may be special to Wisconsin). The test of ready ascertainability is satisfied by so much of Afram's claim as seeks simply the difference between the contract price, a fixed amount, and the market value at the date of breach. (We need not worry whether the test is also satisfied by Afram's claim for incidental damages, for we have held that it has no good claim to those damages, or by its claim for the costs of its "public" sale, which we said was not a bona fide sale at all.) The market value of clean shredded scrap was readily ascertainable. The scrap was not like the airplane in the *Potter* case, where the estimates of market value ranged from $45,000 to $95,000. (With *Potter* compare the allowance of prejudg-

ment interest by the same court in *Summit Court, Inc. v. Northern States Power Co.*, 354 N.W.2d 13, 16 (Minn.1984), where the estimation of damages was a good deal less certain than in the present case.) Hence Metallurgiki could have stopped the interest clock from running (if it was not content to have the use of the money, subject to being ordered to pay interest later for its use) by tendering the difference between the contract price and the market value as fixed by the sales to Luria Brothers and International Traders. Cf. *California Wine Ass'n v. Wisconsin Liquor Co.*, 20 Wis.2d 110, 132, 121 N.W.2d 308, 320 (1963).

Although there was disagreement over the actual amount of damages, Afram's claim cannot be viewed as substantially inflated when less than 25 percent of the claim, relating to the cover price and the incidental damages, was in dispute. (The costs of the public sale were only $1,088.) Compare the nearly 100 percent overstatement in *Congress Bar & Restaurant, Inc. v. Transamerica Ins. Co.*, 42 Wis.2d 56, 71, 165 N.W.2d 409, 417 (1969). Prejudgment interest was awarded in *Amoco Oil Co. v. Capitol Indemnity Corp.*, 95 Wis.2d 530, 547–49, 291 N.W.2d 883, 892–93 (Ct.App. 1980), even though the amount of damages awarded was the amount the defendant had originally offered rather than the larger amount sought by the plaintiff. That was a weaker case for prejudgment interest than this one.

What must give us pause though is the statement in *Congress Bar & Restaurant* that, "As long as there is a genuine dispute about the amount that is due, the insurer should not have to pay interest until the amount has been determined and judgment entered thereon." 42 Wis.2d at 71, 165 N.W.2d at 417. Like all judicial language, however, this must be read in context. The case involved fire damage which proved difficult to estimate, and as mentioned the plaintiff's estimate was way too high. There was no contract price to provide a lodestar. The court in *Congress Bar & Restaurant* quoted approvingly the state-

ment made in many Wisconsin opinions that "before interest can be recovered the amount claimed must be fixed or determined *or readily determinable*," e.g., *California Wine Ass'n v. Wisconsin Liquor Co., supra,* 20 Wis.2d at 132, 121 N.W.2d at 319—and the words we have italicized describe this case.

■■■■■ The last question is whether Afram is entitled to an award of attorney's fees for resisting what it describes as Metallurgiki's frivolous counterclaim. The interposing of meritless counterclaims is a common and deplorable tactic in litigation, designed either to get some leverage over the plaintiff in settlement negotiations or to throw mud in the eye of the trier of fact. But the only basis on which Afram describes Metallurgiki's counterclaim as frivolous is that at trial Metallurgiki put in no evidence to support it. The abandonment of a claim does not show that it is frivolous, and it would be a serious mistake to adopt a rule that gave parties an incentive to litigate claims merely to avert an award of attorney's fees. Indeed, if discovery failed to produce evidence supporting Metallurgiki's counterclaim, Metallurgiki's counsel had an ethical duty not to press the claim at trial.

If there were some showing that the counterclaim had been frivolous from the beginning, or that counsel had pressed it after discovering the lack of evidentiary support for it, we would have a different issue. But Afram put in no evidence of any such thing. Cf. *Robertson-Ryan & Associates v. Pohlhammer,* 112 Wis.2d 583, 589–90, 334 N.W.2d 246, 250 (1983); *Anthony v. Marion County General Hospital,* 617 F.2d 1164, 1170 (5th Cir.1980). What is true is that once the judge decided to believe testimony offered by Afram concerning Shields' acceptance of the scrap on Metallurgiki's behalf (a decision made easier by Anastossopoulos's absence), any argument that Afram rather than Metallurgiki had broken the contract fell to the ground, and with it the counterclaim. But Metallurgiki could not have known how the judge would decide, when it filed its coun-

terclaim; at least Afram has not shown that it could have known this. Apparently the counterclaim was doomed when Mr. Anastassopoulos failed to appear; and this cannot be considered a willful default by Metallurgiki.

Thus we affirm the judgment of the district court except with respect to the denial of prejudgment interest to Afram, as to which we remand the case for a determination of the amount of prejudgment interest to which Afram is entitled at the statutory rate of five percent. Wis.Stat. § 138.04; *Kilgust Heating Div. v. Kemp,* 70 Wis.2d 544, 550, 235 N.W.2d 292, 295–96 (1975). No costs in this court.

Affirmed in Part, Reversed in Part, and Remanded.